**In re SEARCH WARRANT DATED JULY 4, 1977, FOR PREMISES AT 2125 S STREET, NORTHWEST, WASHINGTON, D. C.**

**Appeal of UNITED STATES.**

**In re SEARCH WARRANT DATED JULY 4, 1977, FOR PREMISES AT 2125 S STREET, NORTHWEST, WASHINGTON, D. C.**

**Appeal of FOUNDING CHURCH OF SCIENTOLOGY.**

**Nos. 79–2138, 79–2176.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1980.

Decided Oct. 2, 1981.

As Amended Oct. 30, 1981.

Certiorari Denied April 19, 1982. See 102 S.Ct. 1971.

118

Michael W. Farrell, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Raymond Banoun, Judith Hetherton and Steven C. Tabackman, Asst. U. S. Attys., Washington, D. C., were on the brief for appellant in. No. 79–2138 and cross-appellee in No. 79–2176.

Philip J. Hirschkop, Alexandria, Va., with whom Victor M. Glasberg and Leonard S. Rubenstein, Alexandria, Va., were on the brief for appellee in No. 79–2138 and cross-appellant in No. 79–2176.

Albert P. Blaustein and Jay A. Sigler were on the brief for amici curiae, pro se., urging that the search warrant and search were constitutionally invalid.

Nadine Strassen was on the brief for amicus curiae American Civil Liberties Union, urging that the Court hold that the search warrant and search were unconstitutionally general.

Before ROBINSON, Chief Judge, MacKINNON and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

Separate opinion for the Court filed by Circuit Judge WALD.

Chief Judge ROBINSON concurs in the opinion filed by Circuit Judge WALD.

**PER CURIAM:**

Judge MacKinnon files an opinion in which Chief Judge Robinson and Judge Wald concur, except with respect to Part III, B (entitled "The Bases of the District Court's Decision"), Part X (entitled "The Remand to Consider the Return of Individual Documents"), and the Conclusion. Judge Wald files a separate opinion in which Chief Judge Robinson concurs. Judge Wald's opinion, and Judge MacKinnon's opinion, except for Part III, B, Part X, and the Conclusion, together constitute the opinion of the court. The district court's order is reversed and the case remanded for further proceedings consistent with the opinion of the court.

*So ordered.*

**MacKINNON, Circuit Judge:**

In this appeal we again consider legal challenges by the Founding Church of Scientology (hereinafter, Scientology) to a July 8, 1977 search and seizure by agents of the Federal Bureau of Investigation (FBI) on the premises of the Scientology's Washington, D. C. headquarters. The search, conducted pursuant to a warrant, was for documentary evidence of a conspiracy by, *inter alia*, Scientology officials and agents to steal documents from government offices. Upon the motion of Scientology under Fed.R.Crim.P. 41(e) for return of property "unlawfully seized," [1] the district court, while rejecting Scientology's other challenges to the search and seizure, ruled that the agents had engaged in a *general seizure* violative of the Fourth Amendment and ordered the suppression and return of all 567 of the documents seized. Both sides appealed, and the court stayed its order pending the government's appeal. We now affirm in part and reverse in part, holding that the record does not support the conclu-

sion that the agents executed a general seizure and that Scientology's other challenges to the search and seizure are also without merit. While we reiterate our prior holding that Scientology is entitled to the return of items seized outside the warrant, we note that Scientology has shown the illegal seizure of no item that the government has not already agreed to return.

## I. PRIOR PROCEEDINGS

According to the affidavit filed in support of the July 4, 1977 search warrant that is the subject of this proceeding, the offenses that caused the warrant to be issued were committed in connection with Scientology's tax exemption as a religious institution under the Internal Revenue laws. In support of this objective Scientology set out to obtain government documents

by [valid] FOIA [Freedom of Information Act] actions and covert scientology operations against various United States agencies; those documents gathered through legitimate, non-covert channels are marked "FOI" and those obtained by covert actions are marked "non-FOI". (The distinction is noted so that Church officials can be certain which documents can safely be disclosed for public purposes.) *Covertly obtained documents are those obtained either through outright burglaries or theft by Scientology agents who work for government agencies.*

Affidavit of FBI Special Agent Robert Tittle ("the Tittle Affidavit"), *reprinted in* Joint Appendix (JA) at 61 (emphasis added).

A further allegation in the supporting affidavit states:

In December, 1975 Cindy Raymond, the Collections Officer within [Scientology's] Deputy Guardian for Information, U.S.

---

**1.** Rule 41 provides in part:

(e) *Motion for Return of Property.* A person aggrieved by an unlawful search and seizure may move the district court ... for the return of the property on the ground that he is entitled to lawful possession of the property which was unlawfully seized.... If the motion is granted the property shall be restored

and it shall not be admissible in evidence at any hearing or trial.

Several months after the motion for return was filed a number of Scientology officials were indicted, making the motion in effect a Fed.R. Crim.P. 12 motion to suppress. See note 2 *infra.*

Office, developed a "program" calling for covert operations designed to obtain Interpol documents regarding the Church of Scientology contained in files held by government agencies. That program was developed in response to the general directive contained in Guardian Order [GO] 1634 composed and disseminated by the Guardian Office World-Wide. *All documents not turned over to the Church by the government pursuant to an FOIA request were to be covertly obtained by agents of the Church, according to the Raymond program. That program was to be implemented in the District of Columbia either by burglarizing the targeted office or by placing a secure Scientology agent on the staff of the targeted government attorney.* This agent would have access to the attorney's files and would xerox the sought-after documents and turn them over to Meisner, who supervised the activities of all Scientology covert agents in Washington, D. C.

(*Id.*) (JA 47–48) (Footnote omitted) (Emphasis added).

The warrant directed the search of a fourth floor suite in Scientology's Washington, D. C. headquarters at 2125 S Street, N.W. The warrant contained 162 descriptions of property. Items 1–99 list documents stolen and copied from the office of an Assistant United States Attorney. Items 100–148 list documents stolen and copied from a Justice Department attorney. Items 149–161 list other stolen documents and internal documents of Scientology alleged to set forth Scientology's plan to purloin government documents. Item 162, finally, authorized the agents to seize:

> 162. Any evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government property in violation of 18 U.S. Code §§ 371, 1503 and 641 *which facts recited in the accompanying affidavit make out.*

(JA 39, emphasis added). The reference to the "accompanying affidavit" effectively incorporated a 33-page "Affidavit in Support of Search Warrant" (JA 42–74) that

was attached to the warrant's "Description of Property" (JA 33–41). The affidavit was signed by FBI Agent Robert Tittle and was based on the disclosure of Michael Meisner, who claimed to have participated personally with other Church officials in a conspiracy to burglarize government offices.

The district court originally held that the search warrant constituted a "general warrant" violative of the Fourth Amendment guarantee against unreasonable searches and seizures. Such ruling relied principally on a claim that Item 162 did not sufficiently particularize the offenses. *In Re Search Warrant, Dated July 4, 1977,* 436 F.Supp. 689 (D.D.C.1977). On appeal to this court we reversed, *In re Search Warrant,* 572 F.2d 321 (D.C.Cir.1977), ruling that the district court "gave an overbroad construction of the search warrant, improperly interpreted the relevant offenses, ignored a significant part of item 162 [the reference to the "accompanying affidavit"], and gave an unduly restrictive construction to the Supreme Court decision in *Andresen v. Maryland,* [427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)]." We also held that the magistrate properly found probable cause to have been shown for the search. *Id.* at 323–24. Our judgment accordingly reversed the decision of the district court, vacated the 1977 order in its entirety and remanded the case to the district court for consideration of other grounds alleged for invalidating the warrant that had not been considered by the district court at the initial hearing. The other grounds were (1) that the manner of the search constituted a violation of the Fourth Amendment, (2) that the agents employed unnecessary force in violation of 18 U.S.C. § 3109; and (3) that the warrant was issued on stale allegations of fact. 572 F.2d at 328. We also noted at that time that

> If any of the documents seized in the search by the agents exceed the bounds of the search warrant they should be returned, but the "fruits, instrumentalities and evidence" that were seized, and that are relevant to the particularized offenses and which are specifically referred to in the affidavit and search war-

rant, should be delivered to the government forthwith for use in connection with the grand jury proceedings. Our order herein does not restrict the right of the court to consider and determine whether any specific document may have been seized outside the authority of the search warrant as construed in this opinion. 572 F.2d at 327.

## II. THE REMAND

In response to the district court's request for help in limiting its task on remand, the government indicated by marking on its documents inventory an "R" for each document that the government explained that it was willing to return. These "return items" were those it did not plan to use in any pending criminal proceeding.[2]

The court subsequently held a two day hearing, at which it heard the testimony of fourteen witnesses called by Scientology. Among these were four of the fifteen FBI agents who conducted the search and seizure. Allowing very little opportunity for cross-examination by the government, the court, with Scientology counsel, inquired of these agents the reasons for their seizure of particular documents. The court made plain, however, that it was interested only in those documents that the government had agreed to return.[3] And in fact all but one of the approximately thirty documents that were marked for identification and before the court during the hearing were return items.[4] Despite the government's insistence that the return items were properly seized,[5] the court ruled that the

2. Simultaneously with the search of appellant's Washington offices on July 8, 1977, FBI agents executed two search warrants for the search of Scientology's offices in Hollywood, California. A motion for return of the property seized in that search was denied in two separate opinions by the United States District Court for the Central District of California. *Church of Scientology v. United States*, No. CV–77–2565–MML (C.D.Cal. April 4, 1978); *Church of Scientology v. United States*, No. CV–77–2565–MML (C.D. Cal. July 5, 1978). Appellant's appeal from that decision was dismissed as interlocutory and nonappealable. *Church of Scientology v. United States*, 591 F.2d 533 (9th Cir. 1979).

Meanwhile, on August 15, 1978, a grand jury in the District of Columbia indicted eleven officials or agents of Scientology on multiple charges including conspiracy to steal federal property and to obstruct justice. The defendants moved to suppress the evidence seized in the California search, the Government having agreed that in the case under indictment it would use only the California evidence, and no evidence from the Washington search, pending the outcome of the instant litigation. On September 13, 1979, the District Court denied the motions to suppress. *United States v. Hubbard, et al.*, Cr. No. 78–0401 (D.D.C.). On October 26, 1979, the defendants were found guilty on various counts after a stipulated trial, and were subsequently sentenced to terms of imprisonment and fines. Appeals from those convictions are now pending in this Court.

In addition, on August 15, 1977, appellant filed a civil suit in the District Court against the Department of Justice and other parties, including the participating FBI agents, seeking damages as a result of the Washington search and seizure. *Founding Church of Scientology v. Kelley*, Civil Action No. 78–0107 (D.D.C.).

Proceedings in that case were stayed by order of the court on December 28, 1977, pending final decision in the instant litigation.

3. See, e.g., JA at 360–61.

4. See *infra* at p. 22.

5. "MISS HETHERTON [AUSA] . . . Also, your Honor, I would like to say that we have never maintained or stated that these documents that we are returning, which I am the one who reviewed and decided which ones should be returned—that they are totally irrelevant and that they are not in fact corroborative of the affidavit. We filed a pleading with your Honor, Memorandum in Support of Evidentiary Objection, and in that Footnote 1, we stated that these documents that we're returning are *documents that we don't intend to use*. We don't need them in a criminal prosecution, but a review of them in fact will reveal, as the testimony of the agents has revealed, that they in fact were specific documents, on some occasions, within the first 161 items. That others of them are plainly corroborative of the affidavit [incorporated by reference in item 162]. And counsel [for the Church] continually represents to this Court that we have said that they're totally without any evidentiary value or something of that nature.

That has not been our representation, and as long as counsel is going to insist that that is relevant to anything that this Court has to decide, we think that [the documents to be returned] should perhaps be maintained before this Court, at least in the Court's custody until the proceedings are over.

(JA 899–900) (Emphasis added).

government had admitted that the return items were "innocuous,"[6] and then chose to define "innocuous" as "meaning they have no criminal connotation." (JA 14).

Upon reviewing the testimony, several of the documents just mentioned, and the summary descriptions found in the government's inventory, the district court ruled that the agents of the United States illegally and unconstitutionally executed the warrant and converted their seizure of documents into a *general exploratory seizure* in violation of the Fourth Amendment and of 18 U.S.C. § 2234.[7] With respect to the inventory, the court stated:

> "[a] survey of the inventory of items seized by the F.B.I. agents reveals that [the] selection procedures [they described in their testimony] led to the seizure of several hundred documents—nearly half or more of the seizure—which were not designated by the warrant; and by no stretch of the imagination could they be regarded as within the designated categories of documents to be seized."

(JA 14). The court elaborated:

> the quantity of *innocuous documents* seized . . . [was] not the determining factor in . . . concluding that the seizure is unreasonable. Rather, it is the stark fact that *they* [the innocuous documents] were seized in spite of the fact that they obviously were not included in any of the categories of items to be seized as contained in the warrant, and thus in flagrant violation of the statute (18 U.S.C. § 2234) which is designed to bolster the

effectiveness of the particularization requirement of the Fourth Amendment. (JA 19) (Emphasis added).

The court's order directed the return of *all* materials seized in the July 8, 1977 search (except stolen items) and declared that these materials were to be suppressed as evidence, and not admissible at any hearing or trial. (JA 19–20). The court ruled against Scientology on "all other grounds." (JA 19).

On its appeal, the government contends that the district court erred as a matter of fact in finding that the agents' seizure exceeded the scope of the search warrant, and in any event erred as a matter of law in concluding that the appropriate remedy would be return and suppression of every document seized. On its cross-appeal, in addition to defending the district court's finding of general seizure, Scientology argues that the search warrant was facially invalid, that it was unsupported by probable cause, that any allegations that did support the warrant were stale, that the agents' forcible entry into rooms and file cabinets violated 18 U.S.C. § 3109 and requires return of the documents, and that Scientology was entitled to an evidentiary hearing to impeach the Tittle Affidavit. We discuss these contentions in turn.

### III. THE CLAIM OF GENERAL EXPLORATORY SEIZURE

The finding that the agents "conducted a general seizure" (JA 14) appears to have rested on the subsidiary findings that (1) the agents by their testimony showed they were interpreting the search warrant in an impermissibly broad fashion, (2) many of

---

6. The support cited by the district court for its conclusion that the government considered the return items "innocuous" was as follows. An Assistant United States Attorney (AUSA) told the district court on July 27, 1977 that the return items were those that "on closer examination [were] found not to be relevant to the anticipated criminal proceedings." See JA 14 n.5. On August 12, 1977, another AUSA explained again that the return items were those "which in the opinion of the prosecutors would not be used in any criminal investigation." See *id.* at 15 n.4. The court then said, "That is

what they call innocuous documents?" The AUSA replied:

> Innocuous or whatever adjectives are appropriate. I don't know. I see no reason why documents which fall into that category cannot be returned. [*Id.*]

7. 18 U.S.C. § 2234 provides:

> Whoever, in executing a search warrant, willfully exceeds his authority or exercises it with unnecessary severity, shall be fined not more than $1,000 or imprisoned not more than one year.

the "innocous documents" (those the Government had agreed to return) were seized "in spite of the fact that they obviously were not included in *any* of the categories of items to be seized as contained in the warrant" (JA 19), and (3) the government's inventory of items showed that "nearly half or more of the seizure" was obviously beyond the bounds of the warrant. The court's ultimate finding cannot stand because its subsidiary findings are not substantiated by the record. Before we address these findings, we discuss the evidence concerning the general method of the search.

## A. *The Method of the Search*

The testimony at the hearing on remand revealed that fifteen FBI agents conducted the actual search which lasted 9½ hours.[8] In preparation for the search the agents attended several meetings to discuss and familiarize themselves with the areas and documents described in the search warrant and accompanying affidavit. They were instructed to confine themselves to these areas and documents in their search. (JA 542–43). During the search each agent carried with him a copy of the search warrant and its "Description of Property" and could contact one of the three persons on the scene who carried the supporting affidavit (JA 433, 484, 506, 651, 874). An Assistant United States Attorney (AUSA) was outside the building in a car to advise the agents on issues that might arise in the search, and on at least five occasions guided agents in their interpretation of the warrant. (JA 504–14).

During the search in the Fourth Floor suite specified in the warrant (JA 21) the agents examined 93 file drawers, fourteen desks, three bookshelves and numerous boxes and piles of loose documents. During the 9½ hour search by 15 agents (142.5 total agent hours) they seized 567 documents, which just filled two cardboard boxes measuring 18 inches by 18 inches by 12 inches (JA 204). This averages out to less than four documents for each hour each agent searched. Some documents that were originally seized by an agent were ultimately rejected, during the progress of the search, by a supervising agent and returned to the Church's files (JA 553–54). During the search Scientology representatives were allowed to be present in each room and to take notes and photographs. (JA 442–43, 464–72).

Richard Kimmel, the Scientology's Assistant Guardian for Information, testified concerning the details of the search that he observed:

THE COURT: Well, are you telling me that the first agent who picked the documents up just took each document as he came across and gave them to another man?

THE WITNESS: No, not each document he came across, but from what I saw, each one he felt would be relevant, he gave over.

(JA 467).

I made the assumption at the time that they [the searching agents] were checking off against the warrant or the *itemization of documents on the warrant*. [This indicates a specific search not a general search.]

\*　\*　\*　\*　\*　\*

Q. When you saw agents checking off against a list, did that list resemble the "Description of Property" [JA 32–39] that I showed you previously?

A. As close as I could get, which was within five or ten feet, I think it did.

\*　\*　\*　\*　\*　\*

In another situation, the agent going through the jacket would call off the file number or file caption and the other agent *with the itemization* [the Description of Property in the warrant] might call out what documents were to be looked for in that particular jacket file. [Stronger testimony of a search for documents particularized in the warrant could not be produced.]

(JA 484–86) (Emphasis added).

Representative of the FBI testimony about the general conduct of the search is that of Special Agent Higgins:

**8.** An additional ten agents were present outside　the building.

I had a copy of the description of items in my hand and when I looked through an item I just tried to recollect what the affidavit set out and what the crimes were—and what the specific items were—and as I looked at the document I just would flip through and see whether or not it seemed to conform with what I was instructed to get pursuant to the search warrant, so I would review, as I went through, as I wanted to be sure that what I was taking seemed to be within the purview of the warrant.

(JA 550).

■ This and other testimony satisfies us that there is no tenable claim on this record that the agents were inadequately prepared or adopted a method of search that amounted to the general rummaging operation that the constitutional prohibition against general searches is meant to prevent. The agents were extensively briefed, instructed, and supervised. The court did not find, and there is no basis for finding, that the agents exceeded the geographical scope of the warrant. We thus conclude that the district court was clearly erroneous in ruling that the testimony describing the general operation of the search justified a finding that the search and seizure were unconstitutional.

### B. The Bases of the District Court's Decision

#### 1. The Agents' Seizure of "Innocuous" Documents

Clearly the dominant basis of the district court's finding of a general seizure was its construction that documents the government agreed to return were "innocuous." The court's reasoning seems to have been that from a mere reading of the description of the documents in the government's inventory, and the government's offer to return many "innocuous" items, the court could conclude that the entire search was beyond the limits of the warrant. On this basis the court ruled the seizure invalid in toto to avoid "more and more widespread abuse." (JA 17).

■ We find the district court's analysis deficient. First, the statements by the government attorneys, see notes 5 & 6 *supra*, did not amount to an admission that the search warrant provided no support for the seizure of the "innocuous" documents in the first place, and are no basis from which to conclude that the "officers [agents] . . . *willfully* exceed[ed] the scope of their authority under [the] warrant . . . ." (JA 15) (Emphasis added). The government was stating merely that the items to be returned were not necessary to the then anticipated criminal prosecution, or were cumulative of other evidence seized in the District of Columbia and at Scientology's headquarters in California. See notes 5–6 *supra*. (JA 21, n. 1). In resting its finding on its construction of the purported admissions of government attorneys the district court was clearly erroneous and abused its discretion.

Second, we find the district court's conclusion of a general seizure is unsupported by the testimony of the FBI agents of the reasons they seized particular documents, by the testimony of Kimmel, or by an independent analysis of the documents before the court.

The court first recited extracts from the testimony of agent Higgins that the agents conducting the search "were told to try to get Guardian Orders—relating to Guardian Order 1634." (J.A. 12). Higgins testified that if he "saw a compliance report to that Guardian Order, to [his] understanding of the crimes alleged, that seemed to establish a relationship to the item described in the generalized kind of description of an item [in the warrant] that would be pertinent." (*Id.*) This testimony does not support an inference of an exploratory search. The affidavit in support of the search warrant reported that Guardian Order "GO 1634 (Information Bureau activities re FOI), and others" were "file folders . . . [which] included some programs *directed against* governmental agencies . . ." (JA 63) (Emphasis added). And the warrant authorized the seizure of items relevant to:

153. Guardian Order 1634.

154. Any and all Guardian Orders issued pursuant to Guardian Order 1634 which would be identified as Guardian Order 1634-(number). [JA 38]

The rationale expressed in Higgins' testimony justified the seizures he made of GO 1634 items under the instant search warrant.

 The second extract of Higgins' testimony related to the reasons he gave for seizing "certain items that were labelled Snow White." With respect to these items Higgins testified, "I would read the document over, and if it was something of that nature and there was a word in there that more or less, or a couple of words, or a phrase or paragraph in there that indicated that that particular Snow White document pertained to what would be characterized as overt [sic, should read "covert"] activity, I would take it." (JA 12). Full support for seizing such documents on such reasoning exists in the search warrant and supporting affidavit which is incorporated in the warrant. The search warrant commanded the agents to seize:

155. A Guardian Order generally identified as "Snow White".

156. Any and all Guardian Orders issued pursuant to the Guardian Order generally identified as "Snow White" which would be identified by the mention of "Snow White".

(JA 38). "Snow White" was also described in the supporting affidavit as one of the programs directed against governmental agencies. (JA 63). The illegality of the "Snow White" project was further substantiated by one of the "Snow White" documents that was seized. That document bears date 27 March 1976, covers 4 pages and is entitled "GUARDIAN PROGRAM ORDER" a "secret-program"; "Snow White". It "reports" that "an excellent BI [Bureau of Information] success over the last year was the obtaining of *non-FOI data* ..." (Emphasis added). The reference to "non-FOI," as disclosed above, referred to documents that were "covertly" obtained from the government by burglary or theft. (JA 61). See Tittle Affidavit, quoted at p.

——, *supra.* The same "Snow White" document also states:

PLAN:

To obtain all the secret files on Scientology that are not obtainable on FOI [Freedom of Information] lines ...

(JA 187). A search cannot be justified by the criminality evidenced in seized documents, but when law officers seize an incriminating document, clearly tied to items designated in the warrant, there is no justification for suppressing it.

In further support of his seizure of items "related to Snow White," Higgins explained:

Where I saw items that related to Snow White, I was working under the presumption that we were seeking evidence of criminal conduct, when Snow White is described in that affidavit as [the] main program directed against governmental agencies—which means the main things that were not quite on the up and up .... Because as I went over each document I read, understanding the violations that were being alleged, and I sought to see whether or not Snow White—that particular document that had Snow White on it—meant or related to activities which would have appeared to be criminal. [Tr. 224–225.]

(JA 12). This testimony indicates an exact knowledge of the items specified in the search warrant and of the rationale set forth in the supporting affidavit that justified the seizure of the Snow White documents. (JA 12). The quoted testimony of agent Higgins thus indicates a knowledgeable and proper exercise of his authority under the search warrant and does not support the court's ruling invalidating the search and suppressing all the seized documents.

The district court opinion next recites testimony by agent Joel Dean explaining his basis for seizing a pleading file in a lawsuit brought by Gregory Taylor. He testified that he took the document under item 162 of the warrant, quoted at p. 120 *supra.* Dean testified that Taylor's presence at the headquarters when the search was being conducted caused him to conclude

that he could have been a participant in the Scientology's plan to obstruct justice *in regard to the theft of government property* [which 162 specifies]. Tr. 279. (JA 13). Dean also recalled that the Internal Revenue Service had originally arrested Taylor, mistaking him for one Wolfe, who had actually stolen some IRS documents. See Part VII *infra*. Whatever deficiency there may be in Dean's reasoning for seizing the pleading in the lawsuit, his action was directed at the designated purposes of the search and not some unrelated crime. This incident may reflect at most a negligent misinterpretation of the warrant; it does not furnish a basis for invalidating the entire search.

The district court's opinion also cites Dean's testimony that he seized some documents under the plain view doctrine. The document bearing computer No. 58287 pertaining to *codes* was specifically mentioned. This document listed various "codes—codes for different terms, names, and words . . . ." Dean testified he seized this document "because it would be a valuable key in the entire 161 items to understand them in their entirety":

> It's a listing of codes, and knowing the other 161 items could have codes, and after reading this, I selected this and seized this so we could interpret the other items that were seized in regard to the affidavit. [Tr. 323–325.]

(JA 13). Using this justification, and relying on the plain view doctrine, Dean seized a package of codes which accounted for 14 items in the government's inventory of seized documents.

■ We find that Dean's plain view seizure was lawful. Evidence of crime that comes into "plain view" of law enforcement officers during a lawful search may be seized even if they have no warrant to search and even if the crime was not that which justified the search. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 464 (1971); [9] *Harris v. United States*, 331 U.S. 145, 154–55, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947). *See United States v. Robinson*, 414 U.S. 218, 236 (1973); *see generally United States v. Johnson*, 561 F.2d 832 (D.C.Cir.) (*en banc*), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977); *United States v. Reese*, 561 F.2d 894, 903 n.17 (D.C.Cir.1977); *United States v. Mason*, 523 F.2d 1122, 1127 (D.C.Cir.1975). It follows that officers armed with a search warrant for certain items may seize other items in plain view that are clearly tied to the crime alleged in the warrant. *Cady v. Dombrowski*, 413 U.S. 433, 448–50, 93 S.Ct. 2523, 2531–32, 37 L.Ed.2d 706 (1973); *Marron v. United States*, 275 U.S. 192, 198–99, 48 S.Ct. 74, 76–77, 72 L.Ed. 231 (1927). This principle is fully applicable to searches for documents, even though the "plain view" of the contents occurred while the officer was inspecting documents to determine their significance. *United States v. Ochs*, 595 F.2d 1247, 1256–57 & n.8 (2d Cir. 1979) and cases cited. An earlier opinion to the same effect is *Abel v. United States*, 362 U.S. 217, 238, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960). Dean thus gave a valid reason for his conduct in seizing the "code" material. The key to the code used in some of the documents authorized to be seized was definitely relevant and necessary to correctly interpret a great many of such documents. There is nothing insensitive in seizing a code book to de-code documents directed to be seized that turned out to be written in code. A search would not be reasonable if searches were required to seize documents that could not be interpreted.

The final item of testimony that the district court recited as justification for its

9. *Coolidge* requires: (1) that the agents who make a plain view seizure must lawfully be at the site when they observe the matter in plain view and must make the seizure within the limits of the area where their presence is lawful; (2) an item that is not specified in a warrant must be sufficiently incriminating on its face to establish probable cause for its seizure despite the absence of its being mentioned in a warrant; and (3) the agent must come upon the unspecified item inadvertently. The requirement of inadvertence permits the agent to be validly searching the area or examining a document for evidence of another crime. *Abel v. United States*, 362 U.S. 217, 238, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960); *United States v. Ochs*, 595 F.2d 1247, 1256–57 & n.8 (2d Cir. 1979).

suppression order was that of agent Charles Booth. He testified to the seizure of a document with a large "SW" on the top "which he took according to items 152, 155 and 156 of the warrant." Item 152 designates "GO 1361" for seizure and items 155 and 156 are the specific "Snow White" Guardian Orders quoted above. The supporting affidavit also indicates that Guardian Order "GO 1361 (IRS SW)" was one of the programs directed against governmental agencies. (JA 63). "IRS SW" would indicate the Snow White project against the Internal Revenue Service. Booth accordingly interpreted the SW as meaning " 'Snow White'. . . which was listed in the search warrant." The SW document also contained the notation "utilize BI for help in leads for discovery . . ." Booth construed this as indicating a plan by Scientology's Bureau of Information (BI) to attempt "to put a source within the FBI to obtain any information that they couldn't get or did get under the Freedom of Information." He concluded it came under the warrant's designation of Guardian Order 1361 [Tr. 504–05] (J.A. 13). This indicates he understood the nature of the Snow White program as set forth in the supporting affidavit. The seizure of the document was authorized by the search warrant.

The testimony cited by the district court thus fails completely to make out any general rummaging operation. In most instances the agents were able to produce a satisfactory explanation of how they related the item they seized with a specific authorization in the search warrant. Read fairly, the testimony confirms the other testimony and circumstantial evidence, see Part III.A, *supra*, indicating that the agents took "care to assure that [their search was] conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976).

2. The Seizure of Items Alleged to be Obviously Beyond the Scope of the Warrant

■ Nor is support for the district court's conclusion of a willfully overbroad seizure to be found in an independent evaluation of the seized documents before it. These documents were filed by Scientology at the suppression hearing to show that they were illegally seized and justified suppressing the entire search. I have examined each of these documents as well as any testimony of record relating thereto. What follows is a description of each document and reasons for seizing them under the designations of the search warrant. Transcript references are to any testimony concerning the exhibit and the item in the search warrant designating the item for seizure. The separate statement, p. 3–4, asserts that such review of the documents and the record is beyond the function of an appellate court. But when the record is clear an appellate court can interpret a document and a search warrant as well as a trial court.

(1) Exhibits 13–16, 34 includes a court pleading and papers in FOIA and constitutional tort cases. The agents were informed by the affidavit that Scientologists were engaged in a conspiracy that involved the stealing (and photocopying) of government documents. This information would permit seizure of court pleadings such as these, in which the United States was a party, since the pleading would then be in federal agency files and its appearance in the files of Scientology might evidence a theft of the agency files. This rationale is particularly relevant to FOIA cases and documents produced thereunder, for the additional reason that many such documents deleted significant information and Scientology's program of stealing documents might be directed at obtaining documents to fill in the gaps caused by redaction of such FOIA documents. Ex. 13, wherein Taylor, and not Scientology, is the private party, is discussed above.

(2) Exhibits 18–26 are documents listing a long series of code designations for various words. Conspirators use codes for the obvious purpose of concealing the nature of their activities. The codes were seizable under item 162 as "instrumentalities" of the

alleged conspiracies and necessary to interpret code words used in designated documents. They were actually related to the specified documents that used the code words they identified and supplied their meaning.

(3) Exhibit 27 was seized under item 156 because it was labelled "Snow White." It outlines a plan to evict its enemy, Interpol, from the Treasury Building through legal action, i.e., a legal approach to accomplish a possibly illegal result—conceal the conspiracy.

(4) Exhibit 28 was taken under item 162. It discloses efforts to enlist churches in an effort to press Scientology's FOI demands. It is relevant to the conspiracy in that Scientology's covert operation was directly related to seizing the documents and obtaining the information by illegal means that could not be obtained legally. The FOI program thus identified documents to be stolen if not obtained legally. If any person, including a church, with knowledge of the illegal aspects of the scheme, aided or abetted the plan, that person would be a potential defendant.

(5) Exhibit 30 was a Snow White item taken under 156. Indicative of its noninnocuous nature was the stated "Snow White Objective[ ]" of "uproot[ing] and cancel[ing] all ["derogatory" and "false"] files and reports whenever found." It was clearly supportive of the conspiracies described in the search warrant.

(6) Exhibit 31, suggesting a plan to "obliterate" United States intelligence, was taken under item 162. Exhibit 32 is a copy of Exhibit 31.

(7) Exhibit 33 is a memo to "Mike" Meisner from "Mitch" which comes under designated item 159. It refers to allegedly false police reports about Scientology.

(8) Exhibit 35 is a one page memo of a cryptic nature. Government counsel stated at the hearing: "That particular document is not the entire document. There were attachments that made specific reference to stolen documents and it is not part of the exhibit." The court responded, "All Right." Tr. 346.

(9) Exhibit 36 apparently accompanied exhibit 35. No explanation is given for its seizure, although it was said to "concern[ ] the D.C. MPD investigation." (Tr. 346). The memo describes a District of Columbia Police Department report on L. Ron Hubbard (Scientology's founder) and does not clearly explain just how Scientology got it. The possibility that this police report was obtained by covert means supports its seizure as evidence supporting the described conspiracies.

(10) Exhibit 37 is a compliance report on Guardian Order 1634 and thus falls under designated item 153. The magistrate found probable cause to seize all designated items and such finding is not successfully attacked here as to any designated document.

(11) Exhibit 38 has the initials "SW" on the left side of the paper. It mentions "FBI Coordination" and using "B–1" (the Bureau of Information) to "utilize every opportunity in discovery to gain further . . . data." It was seized under designated item 155 (Snow White).

(12) Exhibit 39 contains letters written among police officers about Scientology. They were seized under designated item 31: " 'Documents denied in entirety' [on FOIA request] comprised of correspondence between and among members of INTERPOL requesting and transmitting information concerning L. Ron Hubbard and Scientology." (From Description of Property, JA 33).

(13) Exhibit 40 is a compliance report on G.O. 1634 and thus fits under designated item 153. JA 38.

(14) Exhibit 41 is a Snow White FOI document, seized under designated item 155. JA 38.

(15) Exhibit 42 mentions both "SW" and G.O. 1634–3 and so falls under designated items 153 and 155. JA 38.

(16) Exhibit 43 is basically the same as Exhibit 41.

(17) Exhibit 44 is basically the same as Exhibit 41; it is a legal pleading in a Snow White Interpol FOI action.

(18) Exhibit 45, similar to Exhibit 39, was taken under designated item 31. JA 33.

(19) Exhibit 46 is an "SW" memo from one Scientologist to another. Paragraph 5 states that a visitor gave the writer "some documents last July pertaining to the RCMP [Royal Canadian Mounted Police] in Canada, and Interpol. Today he said these documents were 'lifted' by [deleted], who got them out of the files, of RCMP." This document was taken under designated items 155 and 162. JA 38, 39.

(20) Exhibit 47 is an internal IRS memo ["Official Use Only"] taken under designated item 162 as a fruit and evidence of crime. It could well be stolen. JA 39.

(21) Exhibit 48 is a letter from Scientology to a law firm. The agent answered "don't know" as to why this item was seized. Tr. 562. The letter reports on investigations of Scientology by several nations' law enforcement agencies. It does not explain how all of this information was obtained and states "we have a number of investigations still in progress concerning this and other info which I will send to you directly about this FBI 'secret' data." Such reference corroborating covert activities was seizable in order to explain how the information on Interpol was obtained from government sources.

(22) Exhibit 49 consists of files released by the FBI in response to FOIA requests. This might indicate which files the Scientologists were interested in taking. It also might indicate what files they did not receive from a particular law suit and hence which files might be targeted from covert acquisition. It might also indicate redacted information that Scientology would attempt to obtain by covert means. Most of these are Snow White items seizable under designated item 155, although a lack of testimony as to exhibits 49–64 makes this conclusion uncertain. The record thus does not contain sufficient facts to order the return of these exhibits.

(23) Exhibit 55 is a series of letters which indicate that the Scientologists were aware of an English police report to which they had no authorized access. Evidence of an unlawful conspiracy to steal government documents in England may have some bearing on a similar conspiracy to accomplish the same illegal objective in the United States.

(24) Exhibit 57 is apparently a "truth packet" prepared by Scientology to be sent to European law enforcement agencies. Its relevance, if any, may depend on the reference it makes to Interpol, which was one target of Scientology's unlawful conspiracies.

(25) Exhibit 58 is the report of a Scientologist who visited the Coast Guard to view files. As the supporting affidavit states, part of the unlawful conspiracy included a program directed against the Coast Guard.

(26) Exhibit 62 mentions agencies logged under 1634–1–1 project and thus could be seized under designated item 153 of the warrant, which refers to Guardian Order 1634.

(27) Exhibit 64 is the application of Mary Blevins for a job with Scientology, which was rejected, a notation indicates, "because of her State Department and CIA connections." Yet the application of Blevins does not mention these connections. Apparently the Scientologists knew about these connections because (1) she told them (Why were they interested?), or (2) she did not tell them but they knew from other sources (How?). The definite relevance to the described conspiracies is not spelled out, but Scientology's unexplained knowledge of her prior employment by the State Department and CIA would constitute some evidence that the covert action program of Scientology extended to those agencies. The supporting affidavit did refer to CIA documents stolen by Scientology agents that reported on drug operations in South America (JA 63. See also JA at 70 n.22.) The evidence of record does not disclose any basis for suppressing the document.

Each of the foregoing documents is one the Government voluntarily offered to return, except apparently the document whose parts are marked Plaintiffs Ex. 35–36 and which is described above. The above

analysis of these allegedly "innocuous" documents indicates that each of them may have some relevance either to the specific designated items in the search warrant that the agents were "commanded . . . to seize" (JA 21) or as evidence of alleged offenses outlined in the affidavit incorporated in item 162. The documents before the district court at the hearing were, at best, justification for suppressing only a small number of them, all of which the government had already volunteered to return; it manifestly was not justification to conclude the search and seizure were invalid *in toto*.

### 3. The Reliance on the Government's Inventory

■ The third and final basis for the district court's finding of a general seizure is its conclusory reliance on a "survey" of the FBI documents to find that about half of the documents seized could by "no stretch of the imagination . . . be regarded as within the designated categories of documents to be seized." (JA 14). The failure to cite specific documents or categories of documents makes this a finding worthy of no deference. Moreover, a survey of this type is inherently unreliable. The inventory contains only the title, and, at most, a one-sentence general description of each document seized. It does not purport to show why the document was seized, or to identify the search warrant item under which it was taken. As some of the individual documents in the above analysis indicate, a document with an innocuous format and title may contain passages which an agent in good faith could believe to be incriminating. In light of its inability to show that even a significant portion of its own selected sample of documents was seized unlawfully, we must reject as wholly unsubstantiated the district court's reliance on the FBI inventory.

### C. *The Failure of Proof by Scientology*

In sum, the circumstantial, testimonial, and documentary evidence of record falls far short of demonstrating that the agents engaged in an unlawful general search. We acknowledge that law enforcement officials may in some cases exhibit such a disregard for the specific restrictions of a search warrant that an otherwise lawful search may be transmuted into a general search.[10] This however, has not been shown to be such a case. In shifting through well over a hundred drawers or boxes of documents, agents seized a total just filling two cardboard boxes. The uncontroverted testimony, corroborated even by the testimony of a Scientology official who was on the scene, is to the effect that the agents were guided in their search and seizure by continual references to the warrant and the incorporated affidavit. Finally, Scientology produced, at best, only isolated instances of arguably excessive seizures, and not any indication that the agents systematically exceeded the warrant or search for evidence of crimes other than those specified in the warrant. *Cf. United States v. Rettig,* 589 F.2d 418, 422–23 (9th Cir. 1978) (search ostensibly for marijuana actually a search for cocaine).

### IV. APPROPRIATE REMEDY

We also disagree with the district court's conclusion that in this case seizure of some items not authorized by warrant or by the plain view doctrine requires as a remedy the suppression and return of all items seized. On this point the law is clear. Several circuit court cases that have directly addressed the question whether some extra-warrant seizures justify suppression or return of documents seized in conformance with a warrant fully support the severable nature of such seizures: while extraneous

---

**10.** *See United States v. Rettig,* 589 F.2d 418 (9th Cir. 1978) ("the agents did not confine their search in good faith to the objects of the warrant, . . . [which] became an instrument for conducting a general search."); *United States v. Fernandez,* 430 F.Supp. 794, 801 (N.D.Calif. 1976) (defendants objecting to introduction of items seized under the descriptions in the warrant must show that "the seizure of the undescribed items or other misconduct in the search rendered the entire search unreasonable.") *See also Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (items may not be seized pursuant to an open-ended warrant to be completed as search is conducted).

items seized must be suppressed, designated items may be retained.

In *United States v. Forsythe*, 560 F.2d 1127 (3d Cir. 1977), where the warrant authorized a search of the business records of a bail bond agency for bail bond application forms, books, records, cancelled checks, correspondence and related papers, the agents seized a metal safe containing jewelry, cash, receipts and cancelled checks. The cash, jewelry and some relevant papers were returned voluntarily. On such facts the Third Circuit held that the illegal seizure of the non-warrant items did "not justify suppression of highly probative evidence consisting of those documents and records which were legally seized pursuant to the warrant." *Id.* at 1134.

An even stronger case upholding severability is *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) involving a seizure (wire tapping) where there was a failure to "minimize" as to some irrelevant conversations. Appellant contended that all conversations so obtained should be suppressed. It was ruled, however, that the proper remedy was to exclude the extraneous conversations and admit those "the warrant contemplated overhearing." 462 F.2d at 1301. The scope of the remedy for failure to minimize in *Cox* is applicable to a Fourth Amendment case like ours. *Cf. Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), *aff'g* 551 F.2d 467 (D.C.Cir.); *United States v. Scott*, 516 F.2d 751 (D.C.Cir.1975), *cert. denied*, 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976).

The Ninth Circuit applied the severability rule in *United States v. Daniels*, 549 F.2d 665 (9th Cir. 1977), rejecting

the notion that the invalid seizure of . . . letters 'tainted' the rest of [a] search [for marijuana]. The exclusionary rule does not require the suppression of otherwise legal seizures merely because they were part of the same search in which an illegal seizure occurred. . . . *Wong Sun's* "taint" reaches items derived from unconstitutional behavior, not items derived from constitutional behavior even when

contemporaneous with that which is unconstitutional.

*Id.* at 668.

The Fifth Circuit, in another case involving a marijuana search, *United States v. Mendoza*, 473 F.2d 692, 696–97 (5th Cir. 1973), held:

Though in executing the warrant the officers may have seized items which were not within the scope of the warrant, that does not affect the legal seizure of the items which were within the scope of the warrant. *Brooks v. United States*, 416 F.2d 1044 (5th Cir. 1969), *cert. denied*, 400 U.S. 840 [91 S.Ct. 81, 27 L.Ed.2d 75] (1970).

In the *Brooks* case cited in *Mendoza*, the warrant had specified stolen property and "numerous tools suitable for use in burglaries," including "a cutting torch." The stolen property was described as the proceeds of two specified bank robberies. However, FBI agents also seized various articles of clothing, toilet articles and "the like." The court ruled that "[t]he legal seizure of the articles described was not affected by the seizure of additional articles not described." *Id.* at 1050.

Four cases in the Second Circuit also reach the conclusion that searches are severable and that seizure of items not covered by the warrant does not necessarily taint the proceeding so as to require suppression of every item seized. The warrant in *United States v. Dzialak*, 441 F.2d 212 (2d Cir. 1971), was issued to search for stolen property in the home of a suspect. "Binoculars" were specified, but the agents seized 21 Timex watches, three opera glasses, two microscopes and seven telescopes, all of which had been stolen. The court reversed the conviction on the count for possession of the stolen watches but affirmed on the count involving the optical equipment on the theory that such items were sufficiently related to binoculars. Implicit in this result is the holding that the unlawful seizure beyond the items specified in the warrant does not necessarily invalidate the seizure made within the warrant.

The next search case in the Second Circuit held that the seizure (wire tapping) of conversations beyond the hours authorized for interception exceeded the authorization and should be suppressed, but the suppression of all conversations was not required. *United States v. Principie*, 531 F.2d 1132 (2d Cir. 1976). A third case, involving a search incident to an arrest, which is relevant by analogy, is *United States v. Artieri*, 491 F.2d 440, 445–46 (2d Cir.), *cert. denied*, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974). Therein police made a valid warrantless arrest of a narcotics dealer in his home while he was preparing heroin for sale. Heroin within his control was seized and thereafter the officers searched the residence and seized other contraband, which was not introduced at trial. The defendant's argument that the unconstitutional search of the residence justified complete exclusion of all evidence seized was rejected. The court aptly stated the law: "evidence lawfully seized as incidental to an arrest is not transmitted into an unlawful seizure by a subsequent unconstitutional seizure made in the same case." *Id.* at 445.

Finally, in *United States v. Dunloy*, 584 F.2d 6 (2d Cir. 1978), the Second Circuit held that, where police seized some personal papers when searching a safety deposit box for evidence of cocaine, the remedy with respect to any seizure which exceeded the scope of the warrant was not to invalidate the entire search but merely to suppress the excess items.

In this circuit in *Huffman v. United States*, 470 F.2d 386, 390 n.3, 393 n.7 (D.C. Cir.1971),[11] we ruled that a seizure pursuant to a warrant directed to "the magazines 'Modern Girls' and 'Girls' as well as other magazines of a similar appearance and contents" did not authorize seizure of the book "Female Auto-erotic Practices" and three rolls of 8 mm. film. Our decision there implicitly recognized the severability of legally seized from illegally seized evidence and did not require the suppression of the magazines seized under the warrant because of the seizure of the book and film outside the warrant. *Id.* at 393 n.7.

The Supreme Court indicated its approval of the severability approach in *Andresen v. Maryland*. *Andresen* involved two searches—one of a lawyer's office, the other of his associated real estate business corporation. The search warrant authorized police to seize evidence of a specific crime of false pretense involving a single real estate lot, Lot 13T. In the search of the corporation 52 items were seized. The State voluntarily returned 45 items, and at the hearing the trial court suppressed six other items "on the ground that there was *no connection* between them and the crimes *charged*." 427 U.S. at 467, 96 S.Ct. at 2742 (Emphasis added). The net result was that only *one item* out of 52 seized in the search of the corporation's office was not returned or suppressed. The law office search resulted in the seizure of 28 items. Of these the State returned seven and the trial court suppressed four items "on its determination that there was *no connection* between them and the crime *charged*." *Id.* at 467, 96 S.Ct. at 2742 (Emphasis added). Thus out of a total of 80 seized items, 52 were returned and 10 suppressed—leaving a net of 18 items that were retained—22.5%.[12] In the

---

**11.** We reversed *Huffman* on rehearing on other grounds in light of intervening Supreme Court obscenity decisions. 502 F.2d 419 (1974).

**12.** Included in the 18 were "documents relating to a lot *other* than Lot 13T [which were objected to as] not relevant to the Lot 13T charge and were admissible only to prove *another crime* with which he was charged *after* the search." 427 U.S. at 482, 96 S.Ct. at 2749 (emphasis added). The Supreme Court ruled that the evidence relating to the *other crime* was properly seized:

Although these records [relating to a lot other than Lot 13T] subsequently were used to secure additional charges against petitioner, suppression of the evidence was not required. The facts that the records could be used to show *intent* to defraud [a consistent pattern of conduct relevant to intent] with respect to Lot 13T permitted the seizure and satisfied the requirements of *Warden v. Hayden* [387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782].

course of its opinion the Supreme Court adverted to the execution of the search warrants:

> The record discloses that the officials executing the warrants seized numerous papers that were not introduced into evidence. Although we are not informed of their contents, we observe that to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others.

*Id.* at 482 n.11, 96 S.Ct. at 2749 n.11. *Andresen* thus supports the procedure of permitting the government to return voluntarily the items seized that are not relevant to the charge and to retain all items seized in accordance with the warrant—even where 51 out of 52 seized items were returned or suppressed.

Our prior opinion in this case reflected the advisory language in *Andresen* in informing the district court that "documents seized in the search by the agents exceed[ing] the bounds of the search warrant should be returned," but documents "relevant to the particularized offenses and which are specifically referred to in the affidavit and search warrant[ ] should be delivered to the government forthwith." 572 F.2d at 327. The district court, in ordering the wholesale suppression and return of the documents in disregard of this directive, cited not one case in favor of its position. Rather, it sought to distinguish cases tending to support a severability approach.

Scientology cites cases that do support wholesale suppression, but on facts far removed from those present here. In *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1979), the entire fruits of the search were suppressed because (1) the agents unreasonably exceeded the limitations of the warrant and searched for evidence not shown on the face of the warrant and (2) "it was not possible for the court to identify after

the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant." *Id.* at 423. Neither circumstance is present here. In other cases cited, such as *United States v. Burch*, 432 F.Supp. 961 (D.Del.1977), *aff'd mem.*, 577 F.2d 729 (3d Cir. 1978) and *Application of Lafayette Academy, Inc.*, 462 F.Supp. 767 (D.R.I.1978), *aff'd*, 610 F.2d 1 (1st Cir. 1979), the search *warrant* was held to be invalid as a general warrant. Here, by contrast, the search warrant has been held to be facially valid. Only its execution is at issue. Thus, in the cases cited by Scientology, what was involved was not a basically sound search and seizure with improper seizures of some items, but warrant language so general or police conduct so offensive that the court found the officers had engaged in an impermissible exploratory search. The search here was not unlawfully exploratory since the agents searched for designated documents, seized some documents in plain view that were relevant to the designated offenses or documents, and did not generally explore for documents outside the offenses or documents specified in the warrant.

It is apparent from the above cited case law that the record here does not justify a ruling that *all* items seized must be suppressed and returned.

## V. FACIAL VALIDITY OF THE SEARCH

Urging an alternative basis for upholding the district court's wholesale suppression order, Scientology invites us to reconsider our prior holding that the search warrant was facially invalid. Scientology contends that the warrant, read in light of the agents' interpretation of it, is too vague and overbroad to withstand scrutiny. We reject that contention. We adhere to our holding that the warrant is valid on its face. Our examination of the record, including the agents' preparation, their conduct during the search, and the low percentage of docu-

---

*Id.* at 484, 96 S.Ct. at 2750 (Emphasis added). The records relating to a lot other than Lot 13T

were obviously seized under the plain-view doctrine.

ments they seized (as opposed to those they necessarily perused),[13] only confirms our impression that "[t]he recited facts and designations of property and offenses impose particular limits upon the search warrant . . . ." 572 F.2d at 326.

## VI. PROBABLE CAUSE FOR THE WARRANT

■ In our prior consideration of this case, we stated our "agree[ment] with the finding of the United States Magistrate that the affidavit did show probable cause." 572 F.2d at 326. We remanded, not for a hearing on whether probable cause supported the warrant, but, inter alia, for a hearing on whether the factual statements were stale, a question relevant only if probable cause is first established. We decline Scientology's invitation to depart from our prior determination. The inclusion of each of the 162 items in the search warrant is supported by a reading of the affidavit or its accompanying "Source of Documents" sheet; each was a fruit, instrumentality or evidence of a specified crime.

Scientology makes the further contention that there was no justification for searching any office but the Information Bureau in its building. Scientology Br. at 25–28.

Scientology concedes that the search warrant designates "the Fourth Floor . . . [housing] the offices of the P. R. Bureau, the Information Bureau, the Legal Bureau and the Assistant Guardian's office . . . ." (JA 21), but disputes that there was probable cause for a search of that breadth. The supporting affidavit, however, states "that the *guardian's offices* and their operational and *administrative bureaus* in the Church of Scientology have maintained files containing documents reflecting *all* activities of the church . . . since inception of the Guardian's Office in 1966" (JA 61). (Emphasis added). And all of the Bureaus designated in the warrant that were searched in the same suite of offices were under the "Assistant Guardian D.C.," including the "Assist. Guardian Finance." (Organizational Chart," JA 74).[14] The affidavit thus supported probable cause to search all the offices from which documents were seized, all of which were in the Fourth Floor area specified in the affidavit and warrant. The single door leading to the suite bore the sign "Office of the Assistant Guardian," and only one door to the offices inside the suite bore a descriptive sign indicating the office of the occupant.[15]

---

**13.** In *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Supreme Court rejected an argument that a search warrant was unconstitutionally general where police seized from two to five percent of the files in the rooms searched and where 65% of the items seized were voluntarily returned and another 12.5% were suppressed. *Id.* at 466–68, 96 S.Ct. at 2741–42, see TAN 10 *supra.* The figures here are comparable. It appears the agents took two 12″x18″x18″ boxes of documents from rooms containing well over a hundred boxes, desk drawers, and file cabinet drawers. (JA 204). According to the inventory by computer 63% of the items were offered to be voluntarily returned by the government. (JA 128). Scientology's failure to challenge specific documents that the government wanted to retain leaves us with no basis for determining that any of the retained items were seized unlawfully.

**14.** The affidavit also lists the following five bureaus as being part of the "Guardian World Wide"—"Information, Public Relations, Legal, Finance and Social Coordination." (JA 42).

**15.** Indeed, probable cause existed to search not only the Information Office but also the other designated bureau offices of Scientology in the District of Columbia. And, the supporting affidavit would have justified a broader search within Scientology's files for the "plans, scenarios and directives" (*id.*) prepared in furtherance of the conspiracy to obstruct justice by suborning Meisner and Wolfe to testify falsely before the grand jury. The supporting affidavit, which was incorporated into the search warrant, states specifically that "officials of the Church of Scientology conspired to obstruct justice by preparing a false response to expected inquiries of Meisner and Wolfe by law enforcement authorities and federal grand juries; that *plans, scenarios and directives* were committed to writing in furtherance of this conspiracy, that such writing are secreted in *the files of the Church of Scientology* in Los Angeles, California, and *Washington, D.C.* . . . ." (JA 71). (Emphasis added). Therefore the searchers were not limited to the files of the Guardian Office or the Information Bureau in Scientology's Washington office in searching for these *designated documents* as the Separate Statement states in footnote 1.

## VII. THE CLAIM THAT THE SUP- PORTING AFFIDAVIT WAS BASED ON STALE INFORMATION

Scientology also contends in its cross-appeal that the information supporting the warrant was stale and failed to support a finding of probable cause to search for the documents in the District of Columbia. There is no merit to either point and the district court was not in error in rejecting such contentions.

The affidavit in support of the search warrant was executed by Special Agent Tittle on July 4, 1977 and the search was conducted on July 8, 1977. It quoted extensively from information furnished in June 1977 by Michael Meisner, who had achieved high office in Scientology's heirarchy. Starting as a staff officer, Meisner became Assistant Guardian for Information and then National Secretary for Information (JA 43, 63). Through his positions of high responsibility he acquired firsthand information of Scientology's most sensitive operations and method of keeping records. (JA 43). Moreover, as an actual participant, he had firsthand knowledge of the burglaries and other covert operations. In fact, most of the government documents that were covertly obtained in 1975–76 bear his signature ("Mike"). (JA 61).

According to the sworn affidavit, in mid-1976 Meisner and Gerald Bennet Wolfe, a Scientology agent in the employ of the Internal Revenue Service, were discovered while preparing to steal documents in the United States Courthouse in Washington, D.C. (JA 53–54). Anticipating the indictment of Meisner and Wolfe, Scientology officials conferred with them to fabricate consistent perjured testimony for the grand jury. (JA 57). Wolfe was arrested and testified in accordance with the scheme, while Meisner, pursuant to the plan, went into hiding. In April 1977, when Meisner told Scientology officials he wanted to return to D.C., he was held against his will, although he retained continuing access to confidential information concerning Scientology. (JA 60). After a substantial period of confinement Meisner escaped and noti-fied the authorities on June 20, 1976 that he wanted to cooperate in the ongoing investigation of the government office burglaries he had helped to perpetrate. (JA 60). The information he then provided is the basis of the Tittle Affidavit.

This information, if not stale by the time the FBI acted on it, furnished overwhelming probable cause to search the D.C. offices of Scientology. Meisner reported that he personally filed copies of covertly obtained documents at the Scientology's D.C. office (JA 48), and that they were retained in the fourth floor office of the Assistant Guardian for Information (JA 52). This office maintained files of documents similar to those in Los Angeles (JA 69). The affidavit reports Meisner as relating:

> [S]ince many of the government agency documents maintained in Los Angeles were acquired through the efforts of D.C. operatives, and since copies were always retained in the D.C. Bureau, copies of the self-same documents are filed in both locations.

(JA 69). In addition the affidavit stated that the operational and administrative bureaus had files (JA 61); the Finance office in D.C. received copies of stolen documents (JA 69); it was the practice in Scientology's offices for the files to follow the personnel (JA 64, 67, 68); "plans, scenarios and directives [were] . . . secreted in the files of the Church of Scientology in . . . Washington, D.C.," and "copies of [the] summary of [Wolfe's false grand jury testimony] were secreted in the offices of the Church of Scientology in Los Angeles, California and Washington, D.C." (JA 71).

 The question remaining is whether the information was stale, thus vitiating the probable cause that would otherwise exist. Meisner related to the affiant, agent Tittle, that he heard in June 1976, shortly after Meisner and Wolfe were confronted by FBI agents in the United States Courthouse, that the relevant D.C. files had been removed from D.C. headquarters for safekeeping in a private residence. (JA 70). In late March 1977, however, Meisner learned from the Scientology official in charge of

the files (the Southeast Secretary of the U.S. Information Bureau of Scientology) that the files had been returned to the office of the Assistant Guardian for Information at 2125 S Street, N.W. In light of the character of the crime described in the affidavit (an elaborate and ongoing conspiracy to collect stolen documents), the highly organized nature of Scientology's operation and record-keeping system, and the practice of keeping the files where the officials could use them, we find the magistrate acted reasonably in concluding there was a probability that documents reliably reported to repose at Church headquarters three months before would still be there. *See Andresen v. Maryland, supra,* 427 U.S. at 478 n.9, 96 S.Ct. at 2747 n.9.[16]

## VIII. THE ALLEGED VIOLATION OF 18 U.S.C. § 3109

■ Scientology also contends the district court erred in failing to rule that the search by the agents violated 18 U.S.C. § 3109.[17] A failure to comply with section 3109 would lead to the return or suppression of the item wrongfully seized. *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

At the inception of the search the first agent announced his presence and identity, showed the search warrant to the employees of Scientology there present, and announced the purpose of the intrusion. (JA 536–37).[18] Agents reaching the fourth floor office of the Assistant Guardian encountered a locked door, at which they knocked and announced their purpose. Scientology official Gregory Taylor acknowledged the knocks but refused for four or five minutes to open the door. Believing that the Scientologists had a paper shredder on the premises, the agents used a carbide saw to gain entry. Taylor then shut and locked one of the inner office doors, which the agents also broke open. Other doors were similarly opened after consultation with an Assistant United States Attorney waiting outside the building. *At no time did any Scientology official tender a key for any door or file cabinet within the Fourth Floor suite,* although they were heard to discuss among themselves the merits of doing so.

Assuming arguendo that section 3109 applies beyond the context of a private dwelling and to the opening of office file cabinets, we hold that the requirements of the statute were met. Persistent obstructionist behavior by Scientology officials, plus their subsequent failure to provide keys, amounted to a continuing "refus[al] [of] admittance" within the meaning of the statute. We therefore affirm this portion of the district court's judgment.

## IX. THE CLAIM OF ENTITLEMENT TO A FRANKS V. DELAWARE HEARING

■ The final contention of Scientology is that the district court erred in denying it an evidentiary hearing in which to test the

**16.** The *Andresen* Court disposed of an analogous staleness claim:

> It is also argued that . . . a three-month . . . time lapse precluded a determination that there was probable cause to believe that petitioner's offices contained evidence of the crime. This contention is belied by the particular facts of the case. The business records sought were prepared in the ordinary course of petitioner's business . . . . It is eminently reasonable to expect that such records would be maintained in those offices for a period of time and surely as long as the three months required for the investigation of a complex real estate scheme. . . . All this, when considered with other information demonstrating that [the subdivision in question] was still a current concern of petitioner,

amply supports the belief that petitioner retained the sought-for records. [*Id.*]

**17.** 18 U.S.C. § 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

**18.** Scientology does not argue that the original entries into the building and the Assistant Guardian's suite were improper. Scientology Br., 43.

veracity of the allegations in the Tittle Affidavit, in accordance with the then-recent holding of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978):

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and ... [the falsehood was material to the finding of probable cause,] the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56, 98 S.Ct. at 2676–77. In attempted compliance with this procedure Scientology presented to the district court affidavits purporting to show that the Tittle Affidavit was materially and intentionally false (1) in stating that "non-FOI" documents were those obtained covertly; (2) in implying that the Snow White program had illegal aspects; and (3) in stating that Meisner learned from a Scientology official in March 1977 that the relevant files had been returned to Scientology's D.C. headquarters.

Even were we to read the Scientology affidavits as truly controverting the allegations in the Tittle Affidavit, we are not persuaded the district court erred in denying the request for an evidentiary hearing. At most, the affidavits showed that Meisner gave false information. They do not amount to a "substantial preliminary showing that a false statement [was included] knowingly and intentionally, or with reckless disregard for the truth, ... *by the*

*affiant*"—Tittle. *Id.* at 155–56, 98 S.Ct. at 2676–77 (Emphasis added). As the Supreme Court went even further to make clear, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted ... is only that *of the affiant, not of any nongovernmental informant.*" *Id.* at 171, 98 S.Ct. at 2684 (Emphasis added).

## X. THE REMAND TO CONSIDER THE RETURN OF INDIVIDUAL DOCUMENTS

The majority, following submission of the foregoing opinion and the conclusion, have filed a separate statement (Sep.Stmt.) in which they direct a remand to afford the district court a third opportunity to consider whether individual documents were seized beyond the scope of the search warrant and accompanying affidavit.[19] In my view the litigation ought to end now rather than provide this third opportunity to consider the documents separately. Our earlier decision, which is the law of the case, *In Re Search Warrant*, 572 F.2d 321, 327 (D.C.Cir. 1977), *rehearing en banc denied*, January 4, 1978, *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), recognized the right of Scientology to have any document returned that exceeded the search warrant "as construed in [said] opinion." This authorized "the court to consider and determine whether any specific document may have been seized outside the authority of the search warrant as construed in this opinion." 572 F.2d at 327. Yet Scientology in both prior hearings failed to introduce any seized documents and thereby must be considered to have abandoned its claim for the return of any document except the substantial number of documents the government previously indicated it intended to return. The California court ruled similarly with respect to the Scientology's similar tactics with respect to its attack on the California search,[20] which was made under

---

**19.** It is incorrect for the majority to assert that Scientology has not had "at least one opportunity to indicate to the district court whether any particular documents must be returned because they fall outside the scope of the warrant

and were not properly seized under the plain view exception to the warrant requirement." (Sep.Stmt. p. 1).

**20.** "Petitioner [Church of Scientology] appar-

an identical search warrant. Recognizing this fact, Scientology's counsel, in a memorandum filed with the court in this case stated "that the warrants the government seeks to keep from the D.C. documents are almost entirely duplicated in the Los Angeles documents which have already been released to the government." Scientology Memorandum, June 2, 1978, Court file, No. 54, p. 12. This may account for its failure to introduce any of the seized documents in this case. Instead it appears that Scientology elected to focus exclusively on theories that would justify suppression of the *entire* seizure. Having foregone its opportunity to introduce or proffer evidence to justify the suppression and return of particular documents, while proceeding with its more ambitious claims, Scientology must be deemed to have waived and abandoned any demand for the return of individual documents (although of course it remains entitled to the documents the government has volunteered to return when the court proceedings no longer require them). Scientology obviously made a strategic decision to forego one, limited form of relief while seeking broader forms. They may still seek to pursue this broader point by certiorari, though certiorari was denied by the Supreme Court, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519, on Scientology's petition attacking the earlier decision upholding the validity of the search warrant on the authority of *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). *Id.*, at 327. *Cf.*, separate opinion of Judges Wright, Bazelon and Leventhal at 572 F.2d 329. It is not for this court to compel counsel to reverse its earlier decision and impose on the district court and all parties concerned the burden of litigating a claim once abandoned and which appears to be essentially frivolous if, as Scientology's

memorandum states, the remaining documents are "almost entirely duplicated in the Los Angeles documents" which have "been returned to the government."

Our opinion and order in *In re Search Warrant, supra*, mentioned four challenges to the search that might be raised on remand: (1) an overbroad search, (2) use of unnecessary force, (3) reliance on stale allegations of fact, and (4) seizure of "any specific document . . . outside the authority of the search warrant as construed in this opinion." 572 F.2d at 327, 328. On the first day of the hearing on remand (April 21, 1978), counsel for Scientology stated there were "four legal arguments as to why the materials that have been seized by the Government should be returned." (App.3 363). These were (1) staleness of the search warrant, (2) failure to serve the affidavit, (3) use of unnecessary force, and (4) "the individual documents." (App.363–66). (Scientology has since raised other grounds. See, e.g., parts VI, IX *supra*.)

The "individual documents" claim was not pursued at the hearing. Scientology thus confined its claim to three points that attacked the entire search. Counsel for Scientology reported that they had "not been able to conform to the Court's request that we give to the Court our list of those documents we think should be returned as opposed to what [the government] might otherwise keep if the warrant itself is valid." (App.366). Counsel explained that the government had been slow in submitting its *listing of what it intended to keep* and that it had failed to supply document numbers corresponding to the document descriptions that appeared on the inventory and on the documents themselves. (App.366–67).

ently decided for its own reasons not to proceed on either of . . . two sub-issues: . . . (a) did the FBI agents seize documents from areas not covered by the warrants, and (b) were *certain seized documents* not within the warrants' specific descriptions of the items to be seized? . . . Petitioner elected not to introduce any of the seized documents and *thereby to abandon its contention that particular documents were illegally seized.* Peti-

tioner has been offered numerous and ample opportunities to present its contention that individual documents were illegally seized; it will not be heard to raise this abandoned issue once again. Accordingly, its request for a hearing on this issue is denied." (Emphasis added) (Footnote omitted) Memorandum of Decision, U. S. District Court, C.D.Cal., No. CV–77–2565–MML, July 21, 1978, Court file, No. 63; p. 3, 8.

Nothing, however, precluded Scientology from listing by document number the items it claimed to be *outside* the authority of the warrant. In fact, in papers filed two weeks later Scientology did list five "non-return" items it claimed were beyond the search warrant (Status Memorandum of the Founding Church of Scientology at 3 (May 5, 1978)). Even then, however, counsel indicated it sought to *avoid disclosure* of the contents of some documents in stating that inquiry into an unspecified number of documents would be avoided to avert "undue disclosure of confidential Church documents." (*Id.*) This is apparently the real reason that Scientology did not press the point. But lack of time was no longer an excuse when, on June 30, 1978, the district court informally told the parties that it would conduct no further hearings in the matter but would give each side an opportunity to submit *any additional pleadings it desired.* Scientology was thus afforded a complete opportunity to present its claim that any specific documents were seized illegally. But three weeks passed and in its July 21 response, the government noted that three months had elapsed since Scientology had professed itself unable to produce a list of the documents it claimed were seized unlawfully, "much less a statement of reasons supporting its challenges." (Proffer of Testimony and Exhibits and Memorandum of Law in Response to Informal Court Order of June 30, 1978 at 26, JA 185.) The government concluded that

> Under these circumstances, petitioner must indeed be deemed to have abandoned its challenge to the individual documents, just as the Church of Scientology of California did in the related matter before Judge Lucas.

(*Id.*)

Judge Lucas' decision involving the documents search at Scientology's California offices, see note 1 *supra*, also stated:

> Petitioner [Church of Scientology] apparently decided for its own reasons not to . . . introduce any of the seized documents, or any other evidence to prove . . . . that seized documents were not included in the list of property to be seized.

Instead, Petitioners abandoned its prior contentions and unveiled a completely new theory.

*Church of Scientology v. United States*, No. CV–77–2565–MML, slip op. at 7 (C.D.Cal. July 5, 1978), *appeal dismissed*, 591 F.2d 533 (9th Cir. 1979).

■ For similar reasons the district court should have held that Scientology abandoned its individual documents claim here, where, again for reasons of its own, Scientology seemed to take an "all or nothing" approach, and persistently failed to proffer any evidence to support a claim to the return of individual documents. Indeed, the most reasonable interpretation of the district court's opinion is that it reached just such a holding in "rul[ing] against petitioner *on all other grounds.*" (JA 19) (Emphasis added). The government had argued to the court that Scientology abandoned its individual documents claim, and Scientology had made no meaningful reply thereto. On this point Scientology simply stated that "The government's reply herein merely argues with the statements previously made by the petitioner in its memorandum and does not require further argument herein with the exception of two points," neither of which was germane to abandonment. Petitioner's Reply to Government's Proffer of Testimony and Exhibits and Memorandum of Law in Response to Informal Court Order of June 30, 1978 at 13 (July 31, 1978).

Petitioner's previous memoranda, however, were no more precise in maintaining any claim that the court should order the return of any specific documents the government sought to keep. Indeed, Scientology's interest in individual documents by all appearances was always coextensive with its interest in a holding that the entire search was exploratory in nature and that therefore *all* documents must be returned. For example, in its Memorandum in Response to Government's Reply of May 11, 1978 (June 2, 1978), counsel for Scientology characterized the four claims it raised at the first day of the remand hearing as claims

[1] that the warrant was stale; [2] that the government used excessive force in the search; [3] that the government failed to make adequate service ... of the affidavit with the search warrant; and [4] that *the search warrant was overbroad* in violation of the Fourth Amendment both as to the geographical area searched and *as to the documents seized.* *Id.* at 6 (emphasis added). Three of these claims coincided with issues we referred to in our earlier opinion calling for a remand but a claim of inadequate service of the search warrant was substituted for an attack on any "specific document ..." p. 2, *supra.* The last claim is clearly *not* a demand for the return of specific documents but a claim that the whole search was overbroad and so many documents were unlawfully seized that the seizure must be deemed invalid in toto. The point is repeated at 12–13 of the Scientology memorandum of June 2, 1978:

> Four [of] the five grounds upon which petitioner originally objected to the July 8, 1977 search of Church premises have not been ruled upon by this Court. Petitioner has asserted that:
>
> ....
>
> (4) The warrant *and search* were overly broad in that the affidavit supplied *no probable cause* to: (a) search offices other than the Information Bureau; or (b) *seize most of the items enumerated numbers 1 through 161 in the "Description of Property."*

(Emphasis added.) Again, by negative but necessary implication, Scientology was not pressing any claim for the return of individual, specified documents, but instead again presents an argument that *avoids disclosure* of specific documents. Some inquiry into individual documents would be germane to the issue of exploratory seizure, of course, but it is clear that Scientology's sole goal was wholesale suppression, not the return of specific documents the government still wanted to keep.

In the light of Scientology's assertions before the district court the government submits that Scientology abandoned any individual documents claim, and that we should interpret the district court's ruling as holding against Scientology on all but one of its claims. Scientology did explain at one point that it was the district court that wanted to confine the inquiry to items the government had already agreed to return. *Id.* at 6. But in light of its exclusive emphasis on broad contentions that comment reeffects only Scientology's interest in using all evidence possible to pursue its "all or nothing" claim of exploratory seizure, and not an interest to pursue an order for the return of specified documents. In any event, Scientology was given a full opportunity to submit any additional pleadings it desired and cannot now complain of any such court-imposed limitation when it has not appealed from it. And this court's present *sua sponte* remand on this point is irregular and its basis is unfounded. Although Scientology appealed from apparent adverse rulings on the staleness, probable cause, excessive force, and evidentiary hearing issues, see parts VI–IX *supra,* it raised no point on appeal concerning any individual documents claim. It thus waived any complaint about the district court's conduct in relation thereto.

▬ In short, although we recognized Scientology's right to seek the return of specific documents seized beyond the authority of the search warrant, and although we remanded for a hearing on that point, among others, Scientology failed to take advantage of that opportunity and therefore abandoned any claim to the return of individual documents. That much is clear, in my opinion, from the parties' submissions to the district court. A party's persistent failure to pursue a claim is grounds to conclude it has abandoned it. *Church of Scientology v. United States, supra; see Foremost International Tours, Inc. v. Qantas Airways Ltd.,* 478 F.Supp. 589, 602 (D.Haw. 1979); *Dawson v. G. Malind, Inc.,* 463 F.Supp. 461, 465 (S.D.N.Y.1978). To the extent that Scientology can complain that the district court somehow tied its hands in this matter, it was incumbent upon Scientology to protest below and to raise the

point here. It did not take advantage of this opportunity. In its May 5, 1978 status memorandum Scientology merely stated that the seizure was invalid because "the documents are not evidence of criminal activity, but private, protected writings." Record, Vol. II, # 43, p. 2. Such defense is a non-sequitur. Scientology also couched whatever claim it did make so that "undue public disclosure of confidential church documents can be avoided." Thereafter Scientology had more than an ample opportunity, as pointed out above, to submit any claim it had for the return of specified documents when the court on June 30, 1978 offered the parties an opportunity to submit *any* additional pleadings they desired. *Supra*, at 2. Scientology's response to this June 30, 1978 offer by the court was a document filed on July 31, 1978 entitled, "Petitioner's Reply to Government's Proffer of Testimony and Exhibits and Memorandum of Law in Response to Informal Court Order of June 30, 1978." Record, Vol. III, # 67, July 31, 1978. In this document under the subheading "Individual Documents Were Improperly Seized," Scientology referred to its previous contention that items 1–148 were not mentioned in the Tittle (Supporting) affidavit, and that items 149–161 were not supported by probable cause in the Tittle affidavit. The substance of this contention is nothing more than the same broad attack that a general search and seizure of the opportunity offered by the court as presenting Scientology with what would be nothing more than a "futile exercise." Separate Statement, n.3. Therefore, it is submitted that the individual documents claim was abandoned below, or was waived on appeal, and has thus been allowed to expire. It is not for this court to revive it. I therefore dissent from the remand on this point.

In my judgment the Separate Statement, *infra*, fails to recognize the full authority to seize documents under item 162 and the incorporated supporting affidavit. It incorrectly assumes that more seized documents depended upon a "plain view" rationale for the validity of their seizure than is actually the case. Some of the agents may have similarly been uninformed as to their full authority under the search warrant. What the Separate Statement does not consider is that many of the documents could be seized as

"fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government porperty [sic] in violation of 18 U.S.Code §§ 371, 1503 and 641 *which facts recited in the accompanying affidavit make out.*"

JA 39, 40–72. (Emphasis added). Thus, as to documents that were instrumentalities of the crimes, like documents reporting on the progress of the alleged illegal ventures, or fruits of the alleged crimes, and stolen government documents, or copies thereof, their seizure was directed by the search warrant and reliance on "plain view" authority was not necessary, though it would be easy in many such instances to rely on "plain view" because the incriminating incidences were so apparent in the document. For example, see our discussion of "Red Box" matter in *United States v. Heldt*, 667 F.2d 572 (D.C.Cir.1981), filed contemporaneously herewith.

## CONCLUSION

For reasons set forth above we hold that the decision of the district court, holding that the search resulted in an unconstitutional general seizure and ordering the suppression of all seized documents except stolen ones, is not supported by substantial evidence in the record and is clearly erroneous. We therefore vacate that part of the applicable order and judgment as there is no showing that the seizure of the documents the Government had decided to retain was illegal in any respect. We affirm the court's dismissal of the Church's remaining challenges to the search. Inasmuch as this should terminate the case, it will be in order, after the times for rehearing and certiorari have expired, for the Government to return the seized documents

it indicated originally it intended to return.[21]

*Judgment accordingly.*

Separate Opinion of Circuit Judge WALD, in which Chief Judge ROBINSON concurs:

I concur in Judge MacKinnon's opinion, with the exception of Part III, B (entitled "The Bases of the District Court's Decision"), Part X, and the Conclusion.[1] I agree that the record does not support the district court's decision that the agents conducted a general search or seizure. *See* Judge MacKinnon's Op. at 119. I am also convinced, however, that the Church of Scientology ("Church") must be provided with at least one adequate opportunity to indicate to the district court whether any *particular* documents must be returned because they fall outside the scope of the warrant and were not properly seized under the plain view exception to the warrant requirement. Since all the members of this panel agree that the Church "is entitled to the return of items seized outside the warrant," Judge MacKinnon's Op. at 119,[2] and since the district court has never made any finding regarding which particular documents were improperly seized, I find that this case must be remanded to allow the district court to perform that task.[3]

**21.** It should be noted that appellant Scientology, its indicted officials and members, have already received substantial benefit from their attack on the search in that Scientology was not indicted and none of the documents seized in the Washington search were used against their officers and members in the criminal trial on their indictment for the various offenses growing out of their burglaries of government offices, the theft of numerous government documents and the attendant conspiracies.

**1.** I must also decline to concur in the majority's footnote 15, because I believe it unnecessary to the opinion, and perhaps incorrect.

**2.** *See also* Judge MacKinnon's Op. at 130, 133–34.

**3.** I cannot agree with Judge MacKinnon's opinion, Part X, that the Church waived its objections to the illegality of the seizure of particular documents below. It clearly announced its intention to present evidence on particular documents that were allegedly illegally seized as outside the scope of the warrant, *in the event that more generalized attacks upon the execution of the warrant failed. See* Joint Appendix ("J.A.") at 163, 360, 366. In the two day hearing on April 21 and 28, 1978, however, the trial judge stated most emphatically and repeatedly that he wished to hear only evidence pertaining to the reasons why documents slated to be *returned* to appellees were seized, not any evidence pertaining to particular documents the government intended to keep or use. *See* J.A. 360, 566, 683–89, 692, 841–42; Government's Brief at 6–7. Judge MacKinnon's Op. at 121. After this "truncated" hearing to which the government vigorously objected as inadequate to air the issues in the case (Government's Brief at 6–7), the court requested any and all additional pleadings to be submitted in writing and ruled subsequently that all material seized (except stolen items) be returned because a "general exploratory seizure" had taken place in violation of the fourth amendment. J.A. 19.

Under these circumstances I do not think that the Church was required to raise individually every document whose seizure it objected to as outside the warrant in post-hearing written submissions at the risk of waiving all such objections. Having been denied any right to present oral testimony or cross-examine witnesses at a hearing as to the circumstances in which each such document was seized, it would most likely have been a futile exercise. Moreover, the Church did indicate a desire and intention to question FBI witnesses on the retained documents. *See* Status Memorandum of the Founding Church of Scientology, May 5, 1978, Record, vol. 2, no. 43 at 2–3; Petitioner's Reply to Government's Proffer of Testimony and Exhibits and Memorandum of Law in Response to Informal Court Order of June 30, 1978, July 31, 1978, Record, vol. 3, no. 67. Indeed it appears that the government itself assumed on appeal that such objections might still be taken to individual documents on remand, once its appeal as to the overall reasonableness of the seizure is won. Government's Brief at 36. ("[O]ur position . . . has been that the District Court's task is to determine what individual documents, if any, were seized without authority and to direct their return. We have screened out those documents we are prepared to return voluntarily (without conceding their illegal seizure) in order to simplify the court's task.") *But cf.* J.A. 185 (government claim below Church had "abandoned" objections to individual documents). Although the trial court in its memorandum opinion finding that a general seizure had taken place also ruled against petitioner "on all other grounds," we do not read that as a blanket dismissal of claims concerning individual documents about which it had refused to hear any evidence or argument during the hearing. Indeed, such a

In Part III, B, Judge MacKinnon's opinion discusses why the district court improperly relied upon the government's offer to return "innocuous" documents as the basis for finding a general search. I agree with Judge MacKinnon that an inordinately heavy reliance was placed upon the government's proffer of return. First, it is apparent that the United States Attorney's Office had not had an adequate opportunity to examine the documents and classify them carefully before making its offer. *See* J.A. at 341, 351–53. More importantly, even if the United States Attorney's classification of "innocuous" documents had been a careful and considered one, such classification simply is not probative of whether each of those documents was lawfully seized. There are a variety of reasons for the government to return documents voluntarily, *e.g.*, they may be superfluous, or unhelpful, or simply duplicative of the many thousands of documents seized in the California search, which were based essentially upon the same warrant. *See generally* Government's Brief at 48–49. The high percentage of documents voluntarily offered for return[4] is therefore not an appropriate basis upon which to find a search unconstitutionally general. Furthermore, treating the government's offer to return seized property as evidence of wrongdoing might have an undesirable effect: "such activity, which should be encouraged, would be chilled: the government will not return property out of fear that it will be interpreted as an admission of impropriety." *United States v. Hubbard*, 493 F.Supp. 209, 234 (D.D.C.1979).

Part III, B, of Judge MacKinnon's opinion also discusses a second basis for the district court's holding of a general search, *viz.*, the testimony of the participating agents. *See* Judge MacKinnon's Op. at 124–127. The district court excerpted remarks by FBI Agents Higgins, Dean and Booth, all related to their conduct and opinions regarding the search. J.A. 12–13. I find these remarks wholly inadequate as a basis for determining that a general seizure occurred. My own review of the testimony before the district court, *see generally* J.A. at 363–896 (testimony of the agents), persuades me that the methods and procedures used were not deliberately overbroad in scope, and were not designed to net documents outside the scope of the warrants. Furthermore, of the 93 file drawers, 14 desks, 3 bookshelves, and numerous boxes and files of loose documents in the suite, the agents seized materials filling altogether only two cardboard boxes measuring 18 inches by 12 inches by 12 inches.[5] The record and the testimony simply do not show a general rummaging by the agents amounting to an unconstitutionally general search which might require the return of all documents.

The final basis for the district court's disposition was its "survey of the inventory of items seized," which convinced the court that "nearly half or more of the seizure" fell outside the scope of the warrant. J.A. 14. On this point I also agree with Judge MacKinnon's analysis, which concludes that "a survey of this type is inherently unreliable."[6] In sum, I am convinced that the district court's decision in this case must be reversed.

Granting that the search was not so broad as to require the wholesale return of everything seized, I do not believe that the Church should be precluded from showing that some particular documents may have been taken unlawfully and therefore should be returned. I cannot accept Judge MacKinnon's document-by-document analysis which attempts to ascertain whether any particular documents were unlawfully seized. It is not the function of this appel-

---

reading would seem inconsistent with its primary ruling that all the material—not just individual documents—had been illegally seized.

**4.** *See generally* J.A. at 128–39 (Church's computer analysis of seized documents estimates that 79% of such documents are to be returned voluntarily).

**5.** *See* J.A. at 204; Government's Brief at 11–12; Church's Reply Br. at 28.

**6.** *See* Judge MacKinnon's Op. at 130.

late court to engage, *de novo*, in a highly factual determination concerning which particular documents were within or without the warrant. The district court has not yet even attempted to perform this task; this matter is therefore not yet appropriate for our review. Furthermore, none of the issues relating to *particular* documents have been briefed or argued orally before this court. The proper approach is a remand to permit the trial court to make this determination. *See generally In Re Search Warrant*, 572 F.2d 321, 327 (D.C.Cir.1977) (holding that the district court may "consider and determine whether any specific document may have been seized outside the authority of the search warrant").

Upon remand, the district court must first ascertain which documents are actually in dispute. The court need not undertake an examination of every single document seized. Instead the parties may be required to come up with a list of documents, not yet returned, about which some dispute exists. Assuming there are such documents, the court should then examine each of them with an eye toward answering two questions: (1) was the document lawfully seized pursuant to the list of particulars contained in the warrant; if not, (2) was the document lawfully seized under the plain view exception to the warrant requirement. If the answer to both questions is no, the document must be returned; otherwise, the government is entitled to retain it. Since the district court, in all likelihood, will have to apply the plain view exception,[7] the following guidance may be helpful in avoiding future unnecessary appeals.

Judge MacKinnon's discussion of the plain view doctrine[8] is insufficiently sensitive to the limitations which govern the seizure of documents nowhere mentioned in the warrant, but seized nonetheless. In *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 464 (1971), a plu-

rality of the Supreme Court found that under certain circumstances police may seize objects in "plain view" when they are searching pursuant to a warrant, even though the warrant does not specify those objects. The Justices recognized, of course, that an expansive interpretation of the plain view exception might swallow the rule of particularization, since

> *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitance of any search, legal or illegal.

*Coolidge v. New Hampshire*, 403 U.S. at 465, 91 S.Ct. at 2037 (original emphasis in original).

Unless these circumstances are identified and applied, any warrant authorizing a search for a particular document might, in conjunction with the plain view exception, permit "government officials to use a seemingly precise and legal warrant only as a ticket to get into a man's home and, once inside, to launch forth upon confined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant." *Stanley v. Georgia*, 394 U.S. 557, 567, 572, 89 S.Ct. 1243, 1249, 1251, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring). Clearly, the plain view exception must be defined in such a way as to preclude using a document search warrant as authority to search for and seize all evidence of wrongdoing in the form of documents which happen to be located at the search site. *Cf. In Re Search Warrant, supra*, 572 F.2d at 324.

Based upon *Coolidge*, courts have formulated three limitations upon the plain view exception. First, the searching agents must lawfully be in the location where their plain viewing occurs, *i.e.*, seizures based

---

**7.** The government acknowledges in its brief that the agents, who believed they were seizing documents at least in part under the plain view doctrine, must obey the doctrine's limitation set out in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 464 (1971). *See*

Government's Brief at 37 n.30; *see also* J.A. at 13 (testimony of agents before the district court); text immediately *infra*.

**8.** *See* Judge MacKinnon's Op. at 126.

upon plain view can occur only within the geographical limitations set out, or implied, in the warrant. *See, e.g., Keiningham v. United States*, 287 F.2d 126, 129 (D.C.Cir. 1960); *United States v. Principe*, 499 F.2d 1135, 1137 (1st Cir. 1974); 2 W. LaFave, *Search and Seizure* § 4.10 (1978). Second, any seized item unspecified in the warrant must possess an incriminating character plainly and immediately apparent on its face, a character sufficiently incriminating to establish probable cause for its seizure despite the absence of a warrant mentioning it. Third, the searching agent must come upon the unspecified items inadvertently. There being no question about the agents' obedience to the geographic limitations of the warrant, we now discuss briefly the latter two limitations on plain view.

The incriminating character limitation necessarily permits a brief perusal of documents in plain view in order to determine whether probable cause exists for their seizure under the warrant. *See generally United States v. Ochs*, 595 F.2d 1247, 1257 n.8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (cases cited). If in the course of that perusal their otherwise incriminating character becomes obvious, they may be seized. *Id. See also Mapp v. Warden*, 531 F.2d 1167, 1172 (2d Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976) ("it would be absurd to require an investigator to be oblivious to that which would be apparent to anyone else with normal powers of observation"). Otherwise, the perusal must cease at the point that the warrant's inapplicability to each document is clear. Searching officers may not cart away documents unspecified by the warrant which simply look somewhat suspicious, comb through them at their leisure and then return them if after careful inspection they do not constitute evidence of criminal activity. That sort of abuse might return us to the days of the general warrant and must be scrupulously avoided.

The other, closely related limitation on the admission of unspecified documents seized under a search warrant is that of inadvertence. *See Coolidge v. New Hampshire, supra*, 403 U.S. at 469–70, 91 S.Ct. at 2040. This requirement has been unevenly applied by courts. *Compare, e.g., United States v. Davis*, 542 F.2d 743, 745 (8th Cir.), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), and *United States v. Wysong*, 528 F.2d 345 (9th Cir. 1976) (courts characterizing as "inadvertent" the discovery of items as to which it appears police could have made showing of probable cause to seize, but failed to do so), *with United States v. Winston*, 373 F.Supp. 1005, 1007 (E.D.Mich.1974) (seizure of item cannot be "inadvertent" if, before searching begins, police have probable cause to seize it). I believe the inadvertence limitation stands for the simple proposition that agents must not be searching for items outside the particulars of the warrant when they conduct the search; in other words, agents must act in good faith to confine themselves to searching for the specified items. *See generally United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978). Because the present record discloses no substantial evidence of bad faith in the agents' conduct with regard to inadvertence, the district court's attention may focus upon compliance with the incriminating character limitation.

---

For the reasons set forth above, Chief Judge Robinson and I find that the district court's holding that the search resulted in an unconstitutional general seizure is unsupported by the record and clearly erroneous. We therefore vacate the district court's order and remand the matter to it to permit a determination as to which particular documents, if any, were seized outside the warrant and must therefore be returned. We affirm the district court's dismissal of the Church's remaining challenges to the search.