UNITED STATES of America, Plaintiff,

v.

Jean Marie SUQUET, et al., Defendants.

No. 80 CR 718.

United States District Court,
N. D. Illinois, E. D.

July 8, 1982.

John L. Sullivan, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

William H. Theis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Defendants have been charged in a multicount indictment with numerous violations of the federal narcotics laws. While investigating these charges, the Government sought and obtained five warrants authorizing wiretaps on the telephones of Thomas Arra and Michael Bounos, two of the principals in the alleged conspiracy.[1] At issue is the lawfulness of the Government's conduct during its initial surveillance of Arra (the "Arra I" surveillance). The defendants contend that the monitoring agents failed to "minimize" the interception of calls not subject to seizure under the warrant, and

---

1. Chief Judge James B. Parsons of the Northern District of Illinois authorized an initial twenty day tap on Arra's phone on June 8, 1978. On June 30, 1978, Judge Parsons signed a warrant allowing the placement of a tap, also for twenty days, on Bounos' phone. The Government persuaded Judge Parsons to authorize a second twenty day Arra tap on July 7, 1978. The Government also obtained two twenty day extensions of their authority to tap Bounos on August 3, 1978 and August 26, 1978. The present opinion deals only with the Government's execution of the initial "Arra 1" surveillance. *See* note 28, *infra.*

that all evidence derived from this surveillance must be suppressed.[2]  For the reasons to follow, the motion to suppress is denied.

### I.

In Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976 & Supp. II 1978) ("Title III"), Congress enacted a scheme of rules regulating the use of wiretap evidence in the federal courts.  Section 2518(5) commands that each wiretap warrant contain

> a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

In compliance with Title III, Judge Parsons inserted the required "minimization" directive in his order authorizing the initial tap on Arra's phone.  *See* Government Wiretap Exhibit 1C at 4.  The issue before the court is whether the Government complied with this command while executing the warrant.

The Supreme Court interpreted the minimization provision in *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978):

> The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations.  Whether the agents have in fact

conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

The inquiry is whether "the government has done all that it could to avoid unnecessary intrusion."  *United States v. Quintana,* 508 F.2d 867, 874 (7th Cir. 1975).

In disputes of this sort, the Government's case is clearly bolstered by a showing that a high proportion of the calls it intercepted revealed information pertinent to the investigation being conducted.  In many of the reported decisions, however, such a showing could not be made.  In *Scott,* only forty percent of the intercepted calls were drug-related and therefore within the literal scope of the warrant.  In *Quintana,* another drug case, over 2000 calls were intercepted, yet "only 153 were ultimately found germane enough to be worth transcribing, and only 47 were used at trial."  *United States v. Quintana, supra,* 508 F.2d at 873.  Nevertheless, in both cases, no minimization violation was found.  Both decisions prove that "there are surely cases ... where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable."  *Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724.[3]

Courts have put forth numerous arguments to justify a finding of statutory compliance in the face of evidence that a significant number of nonpertinent calls were intercepted.  It has often been remarked that

> [l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal

**2.**  Defendants previously moved to suppress on the alternative ground that the warrants themselves should never have issued.  They claimed, *inter alia,* that the Government had failed to establish before Judge Parsons that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *See* 18 U.S.C. § 2518(3)(c).  I rejected these claims by oral ruling on June 3, 1982.

Just recently, defendants filed a new motion.  This time they claim that the warrants are void because the Government intentionally omitted material facts from the supporting affidavits

submitted to Judge Parsons.  This motion is under advisement at the present time.

**3.**  Though numerous minimization decisions have been written since Title III was enacted, I will rely mainly on only *Scott* and *Quintana,* the two decisions binding on this court.  The principles set forth in the remaining cases are basically the same.  They are exhaustively catalogued and discussed in Fishman, *The "Minimization" Requirement in Electronic Surveillance: Title III, The Fourth Amendment, and the Dread* Scott *Decision,* 28 Am.U.L.Rev. 315 (1979).

episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy. *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1019 (1974); *United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir. 1972). *United States v. Quintana, supra,* 508 F.2d at 874.

The location of the tapped phone is also extremely significant. If it "is located in the residence of a person who is thought to be the head of a major drug ring," extensive monitoring may be both permissible and necessary. *Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724. This is especially true at the outset of the investigation when the Government lacks the information it needs to identify the relevant cast of characters. *United States v. Quintana, supra,* 508 F.2d at 874.[4]

A third systemic consideration is the extent of supervision exercised by the authorizing judge.[5] Obviously, a reviewing court is more likely to sanction a surveillance if it has already been subjected to extensive and contemporaneous oversight. *Id.* at 875.

As for particular calls, several types are essentially exempted from the requirements of minimization. These include calls which are "very short"; those which are "one-time only" and involve unidentified voices; and those which are "ambiguous in nature," particularly if they contain "guarded or coded language." *Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724. "In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination." *Id.*

Indeed, as a general rule, an interception made pursuant to a lawful warrant is unreasonable only when the monitored call fits into a pattern of previous calls that the listening agents should have realized were irrelevant:[6]

> During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter. Interception of those same types of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type.

*Id.* at 141, 98 S.Ct. at 1725; *accord, United States v. Quintana, supra,* 508 F.2d at 874–75; *United States v. Dorfman,* 542 F.Supp. 345, at 390 (N.D.Ill.1982). However, there is even an exception to this principle, for it is extremely unlikely that there is any obligation to minimize any call that is made between suspected coconspirators, even if a pattern of innocence[7] has developed in their conversations. At any moment, the pleasantries might cease and the business begin. *See, e.g., United States v. Scott,* 516 F.2d 751, 755 (D.C.Cir.1975); *United States v. King,* 335 F.Supp. 523, 542 (S.D.Cal.1971), *aff'd in part and reversed in part on other grounds,* 478 F.2d 494 (9th Cir. 1973), *cert.*

---

**4.** *Compare Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724 ("[I]f the agents are permitted to tap a public telephone because one individual is thought to be placing bets over the phone, substantial doubts as to minimization may arise if the agents listen to every call which goes out over that phone regardless of who places the call."); *United States v. Dorfman,* 542 F.Supp. 345, at 390–391 (N.D.Ill. 1982) (When a tap is placed in a legitimate business office, "the obligation to minimize [is] substantially greater at the outset" than in cases such as *Quintana.* ).

**5.** *See* 18 U.S.C. § 2518(6) (authorizing judge can require the submission of reports "showing what progress has been made toward achieve-

ment of the authorized objective and the need for continued interception.")

**6.** This statement is made without prejudice to the defendant's right to pursue a "general search" theory. *See infra.* In those cases, the defendant attempts to prove that the warrant was rendered a nullity by the Government's conduct and that no interception was therefore made "pursuant" to a lawful order. *United States v. Heldt,* 668 F.2d 1238, 1257 (D.C.Cir. 1981).

**7.** For example, the co-conspirators may never have been overheard discussing the conspiracy during a particular part of the day.

*denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *see also Scott v. United States, supra,* 436 U.S. at 140, 98 S.Ct. at 1724 (recognizing that a call is likely to be "interceptable" when it "involve[s] one or more of the co-conspirators.") At the very least, claims of pattern must be strictly scrutinized in this context.

## II.

■ Even if a violation of Title III is shown, a defendant is not necessarily entitled to an order suppressing the information obtained through the illegal wiretap. The defendant must also establish that he or she has standing to complain. Thus, when objecting to the introduction of a given call X, a defendant must show that he or she was a party to call X or that he or she has a privacy interest in the premises housing the tapped phone. *Alderman v. United States,* 394 U.S. 165, 176, 89 S.Ct. 961, 968, 22 L.Ed.2d 176 (1969).[8]

With respect to the Arra I wiretap, no defendant can assert the second ground as a basis for standing. Thomas Arra is not a defendant, since the Government voluntarily dismissed him from this case several months back. Likewise, neither Paula Guthery nor Jennifer Arra (Thomas' daughter), the two other individuals possessing a privacy interest in the Arra residence, are defendants.[9] Calls intercepted during the Arra I wiretap are suppressible, if at all, only at the behest of a defendant who was a party to the call in question.

**8.** Of course, a defendant who fits into neither category can also obtain suppression if he or she shows that the seizure of call X was the fruit of a previous invasion of that defendant's privacy rights. In this scenario, the defendant is really challenging the prior illegality, not the interception of X. Call X becomes relevant only at the remedy stage of the analysis.

**9.** There is precedent to suggest that neither Guthery nor Jennifer Arra would have standing to object even if they were defendants. The Second Circuit has ruled in at least two decisions that only the "subscriber" to the tapped phone (i.e., Thomas Arra) has standing to argue a lack of minimization. *United States v. Fury,* 554 F.2d 522, 526 (2d Cir.), *cert. denied sub*

In concrete terms this means that defendant Bounos has standing to suppress the 95 calls he was overheard making during Arra I, and that defendants Browning and Hillon have standing to suppress 2 and 11 calls, respectively. No other defendant appears at this point to have standing to suppress any evidence derived from Arra I.

Bounos, Browning and Hillon have made no effort thus far to show that they were unreasonably intercepted in the sense that their individual calls were part of an innocuous pattern as discussed before. *See* pp. 1037–1038, *supra.* Rather, defendants have attacked the entire Arra I surveillance as a totality and have tried to show that the monitoring agents flagrantly disregarded the minimization directive by committing numerous, unjustified invasions of privacy. Their theory seems to be that such a showing allows the inference that the entire monitoring was conducted without any regard for the limiting terms found in the warrant, and that the Government therefore engaged in an essentially "warrantless" "general search." Since searches of this nature are void *ab initio* and unreasonable in *all* of their manifestations, it follows that *each* interception made during the course of Arra I was illegal, even those which might be thought of as reasonable when viewed in isolation. In a nutshell, defendants' claim appears to be that even if their own calls were legally seized in some narrow sense, the pervasive overmonitoring elsewhere committed by the Government renders the former interceptions void as

*nom. Quinn v. United States,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Poeta,* 455 F.2d 117, 122 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *accord, United States v. Aloi,* 449 F.Supp. 698, 727 n.45 (E.D.N.Y.1977). The better view, however, is that this right is not limited to the subscriber, but extends to at least all individuals living in the subscriber's household. *United States v. Hinton,* 543 F.2d 1002, 1011 n.13 (2d Cir. 1976), *cert. denied sub nom. Cameron v. United States,* 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Ramsey,* 503 F.2d 524, 532 (7th Cir. 1974) (Stevens, J.), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975).

well.[10]  *See United States v. Heldt,* 668 F.2d 1238 (D.C.Cir.1975); *see generally United States v. King,* supra, 335 F.Supp. at 544.[11]

The first question is whether this is a valid theory of suppression.  A few courts have indicated that "Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations."  *United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *accord, United States v. Sisca,* 361 F.Supp. 735, 746–48 (S.D.N.Y. 1973), *affd on other grounds,* 503 F.2d 1337 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).  In the view of these courts, a given call cannot be suppressed solely because other transmissions were mishandled.  Two reasons are usually given for this position.  First, analogies are drawn to the general law of search and seizure: "[T]he seizure of some items beyond those specified in a search warrant does not result in the suppression of those items which were validly seized."  *Id.* at 746; *United States v. Mainello,* 345 F.Supp. 863, 877 (E.D.N.Y.1972); *see United States v. Holmes,* 452 F.2d 249, 259 (7th Cir. 1971) (Stevens, J.), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972).  Second, it is observed that the literal language of Title III authorizes relief only if the actual

"communication" or "interception" which the defendant wishes to suppress was illegally seized.  18 U.S.C. §§ 2518(10)(a)(i) and (iii); *see United States v. Dorfman, supra,* at 394, *United States v. King, supra,* 335 F.Supp. at 545.

■  I am convinced, however, that under certain circumstances, it is appropriate to suppress the entire fruits of a wiretap surveillance even if it cannot be shown that each and every interception was wrongful by itself.  Indeed, many courts which have confronted this issue have recognized, albeit in dicta, that total suppression might be called for in a clear case of monitoring abuse.  *United States v. Turner,* 528 F.2d 143, 156 (9th Cir.), *cert. denied,* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1975); *United States v. Webster,* 473 F.Supp. 586, 598 (D.Md.1979); *United States v. Curreri,* 363 F.Supp. 430, 437 (D.Md.1973); *United States v. Lanza,* 349 F.Supp. 929, 932 (M.D. Fla.1972); *United States v. Leta,* 332 F.Supp. 1357, 1360 n.4 (M.D.Pa.1971).[12]  Even the *Dorfman* and *King* courts did not foreclose this option completely.  *United States v. Dorfman, supra,* at 394 n.59; *United States v. King, supra,* 335 F.Supp. at 544–45.

Moreover, in an analogous context, the United States Court of Appeals for the District of Columbia recently employed a "general search" approach while analyzing

---

**10.**  I understand defendants' constitutional challenges to the execution of the warrant to be encompassed within the "general search" rubric.

**11.**  Of course, mere proof that a listening agent *subjectively* disregarded a minimization order does not by itself make out a minimization violation.  *Scott v. United States,* 436 U.S. 128, 135–39, 98 S.Ct. 1717, 1722–1724, 56 L.Ed.2d 168 (1978).  Judge Marshall has suggested that this aspect of *Scott* undercuts any basis for a "general search" suppression theory.  *United States v. Dorfman, supra,* at 394 n.59.  I am not persuaded.  As discussed more fully later, *see* pp. 1042–1043, *infra,* recovery under a "general search" theory requires proof that the Government *objectively* failed to comply with the minimization requirement a substantial number of times.

**12.**  Total suppression was actually ordered by the district court in the *Scott* case.  *United States v. Scott,* 331 F.Supp. 233, 248 (D.D.C. 1971).  The Court of Appeals criticized this aspect of the lower court's analysis.  *United States v. Scott,* 516 F.2d 751, 760 n.19 (D.C.Cir. 1975).  The Supreme Court noted the issue, but found it unnecessary to resolve.  *Scott v. United States,* 436 U.S. 128, 135 n.10, 98 S.Ct. 1717, 1722 n.10, 56 L.Ed.2d 168 (1978).

One other decision seems to hold that total suppression is the proper remedy for *all* minimization violations.  *United States v. Focarile,* 340 F.Supp. 1033, 1046–47 (D.Md.), *affd on other grounds sub nom. United States v. Giordano,* 469 F.2d 522 (4th Cir. 1972), *affd,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).  Judge Marshall's criticism of this approach is compelling.  *United States v. Dorfman, supra,* at 395.

a motion to suppress. *United States v. Heldt,* 668 F.2d 1238 (D.C.Cir.1981) (per curiam). In *Heldt,* the defendants were convicted at a trial in which 201 documents were introduced following their physical seizure from the offices of the defendants. On appeal, the defendants challenged the manner in which the warrant authorizing the search had been executed. The defendants did *not* claim that the 201 documents were themselves beyond the scope of the warrant; they "virtually concede[d] . . . that the documents were within the Description of Property listed in the warrant." *Id.* at 1259 n.29; *see also id.* at 1260 n.33. Rather, the *Heldt* defendants, like the defendants in this case, argued "that because the search *as a whole* was a general search, all documents therein seized must be suppressed." *Id.* at 1259 (emphasis in original). The Court of Appeals rejected the claim, but not on the ground that the defendants' argument failed as a matter of law to justify suppression. The Court "recognize[d] that in some cases a flagrant disregard for the limitations in a warrant might transform an otherwise valid search into a general one, thereby requiring the entire fruits of the search to be suppressed." *Id.* However, on the facts presented, the Court could not conclude that the required "flagrant disregard" had been shown. The "drastic remedy of total suppression" was hence inappropriate and the case was deemed to be a "normal" one, one in which the seizure of "some items outside the scope of a valid warrant . . . by itself [does] not affect the admissibility of other contemporaneously seized items which do fall within the warrant." *Id.*[13]

■ The precepts set forth in *Heldt* are extremely relevant, for the Title III suppression remedy parallels the remedy recognized by the general law of search and seizure. *Scott v. United States,* 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978); *Alderman v. United States,* 394 U.S. 165, 175–76, 89 S.Ct. 961, 967–968, 22 L.Ed.2d 176 (1969). There should, in fact, be an especially strong congruence between the *Heldt* rules governing document searches and those pertaining to wiretaps:

> We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

*Andresen v. Maryland,* 427 U.S. 463, 482 n.11, 96 S.Ct. 2737, 2749 n.11, 49 L.Ed.2d 627 (1976). Thus, if the monitoring conducted during Arra I evidenced "flagrant disregard" of the limiting provisions contained in the warrant, each defendant will be entitled to an order suppressing each call which he has standing to challenge.

■ The last qualification must be stressed. Even if the presence of a "general search" is established, defendant Hillon can, for example, suppress only those calls in which he himself is a party. Moreover, even these calls remain available for use against the other defendants who are not

---

**13.** In a similar case decided the same day as *Heldt,* the D.C. Circuit reiterated:

> We recognize that law enforcement officials may in some cases exhibit such a disregard for the specific restrictions of a search warrant that an otherwise lawful search may be transmuted into a general search.

*In re Search Warrant Dated July 4, 1977, etc.,* 667 F.2d 117, 130 (D.C.Cir.1981). At least two other non-wiretap decisions recognize the "general search" concept. *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir. 1978); *United States v. Fernandez,* 430 F.Supp. 794, 801 (N.D.Cal.1976); *see also Lo Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979).

parties.[14] *United States v. Scott,* 504 F.2d 194, 197 n.5 (D.C.Cir.1974). Proof of a "general search" merely establishes that each interception violated someone's privacy rights. To obtain suppression, a defendant must still show that the implicated rights are his or her own.

■ Obviously, however, for a defendant such as Hillon to prevail on a "general search" theory (and thereby obtain suppression of his calls), it will be necessary for him to show that the Government failed to minimize third party conversations which he himself has no standing to suppress. Without such evidence, Hillon would be hard pressed to marshal the necessary evidence of "flagrant disregard." *Church of Scientology of California v. Linberg,* 529 F.Supp. 945, 964 (C.D.Cal.1981). Such proof is permissible. In the postulated scenario, Hillon would be relying on the third party calls only as evidence; he would not be trying to suppress them. *United States v. Heldt, supra,* 668 F.2d at 1258 n.28; *United States v. Scott, supra,* 504 F.2d at 197.[15]

To summarize, defendants have "stated a claim" to the extent they seek to suppress their own calls with proof of a "general search." In making out this claim, defendants will be entitled to refer to the Government's minimization record with third party calls. However, in all events, defendants can suppress only those calls in which they themselves participated. I turn next to the evidence which has been presented on the issue of "general search."

### III.

In *Heldt* the Court of Appeals looked to three factors in determining whether a general search had occurred. The Court examined the extent to which the agents conducting the search had been briefed on the warrant's scope and limits. It further examined whether the agents had confined their search to the areas specified in the warrant. Finally, it analyzed the extent to which the agents had in fact seized documents not contemplated by the warrant.

**14.** Defendants have argued that under *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), evidence which is suppressed in favor of one defendant cannot be used against a co-defendant, regardless of whether the latter individual has standing to challenge the evidence individually. To the extent such a ruling was rendered in *McDonald,* it was overruled in *Alderman v. United States,* 394 U.S. 165, 173 n.7, 89 S.Ct. 961, 966 n.7, 22 L.Ed.2d 176 (1969). *See United States v. Holmes,* 452 F.2d 249, 263 n.20 (7th Cir. 1971) (Stevens, J.), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972).

**15.** *But cf. United States v. Ramsey,* 503 F.2d 524 (7th Cir. 1974) (Stevens, J.), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975). In *Ramsey,* a tap was placed on the phone of one individual suspected of drug dealing. During the course of the surveillance, a second person was overheard discussing drugs on three occasions. All three calls were introduced at trial, and the second individual was convicted. He appealed, claiming a failure to minimize.

The three intercepted calls were clearly within the scope of the warrant, and the defendant had no arguable claim under a direct suppression theory. Though the Court's opinion is not explicit on this issue, it appears that the defendant was raising a "general search" claim. The Court, however, refused to reach the mer-

its, holding instead that the defendant lacked standing to make his argument. He was not the subscriber to the tapped phone and he did not have a privacy interest in the premises housing the phone. Moreover, he had never been intercepted during an "innocent conversation." *Id.* at 532; *see also Scott v. United States,* 436 U.S. 128, 135 n.10, 98 S.Ct. 1717, 1722 n.10, 56 L.Ed.2d 168 (1978) (defendant had standing to challenge the Government's alleged failure to minimize third party calls because the defendant was "a party to some nonnarcotics-related calls" which had been seized; the Court did not rely on the fact that the defendant apparently also had a privacy interest in the premises which were tapped). Under *Ramsey,* it might thus be argued that a "general search" claim can be made only by a defendant who can show that he or she made at least one of the "inordinate number" of calls that the Government allegedly failed to minimize. This standard might be justified on the ground that a defendant cannot "contest the admission of an interception *solely* on the ground that other conversations to which the movant was not a party were unlawful." *United States v. Pine,* 473 F.Supp. 349, 353 (D.Md. 1978) (emphasis added). Given my ultimate findings, however, I need not decide whether this interpretation of *Ramsey* is correct.

The second factor—the respect shown for area limitations—has little if any relevance in a wiretap minimization inquiry. To the extent that an eavesdropping search can be said to take place in a defined "area" at all, that area is presumably the space containing the tapped phone. Here, there are no allegations or facts suggesting that the Government monitored residences not listed in Judge Parsons' order.

Moreover, when wiretapping is challenged, the first factor cannot assume the importance it apparently has in the document search context under *Heldt*. The Court there was of the opinion that a warrant can be properly executed "[o]nly when the agents are *aware* of the warrant, through personal knowledge or instruction." *Id.*, 668 F.2d at 1261 n.35 (emphasis in original). "Minimization designed to control the proper scope of the search *cannot* occur without such knowledge." *Id.* at 1262 (emphasis added). To the Court, if the searching agents are unaware of the contents of the warrant, they are necessarily unable to make good faith efforts to adhere to its terms; the presence of a general search is likely. *See also id.* at 1268–69.

█ The Court's implicit reliance upon notions of good faith must be reconciled, in the wiretap context, with *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The evidence in *Scott* established that the monitoring officers made no effort at all to minimize:[16] "the only steps taken which actually resulted in the nonreception of a conversation were those taken when the agents discovered the wiretap had inadvertently been connected to an improper line." *Id.* at 133 n.7, 98 S.Ct. at 1721 n.7. In the Supreme Court, the petitioner's "principal contention [was] that the failure to make good-faith efforts to comply with the minimization requirement [was] itself a violation of § 2518(5)." *Id.* at 135, 98 S.Ct. at 1722. The Court unambiguously rejected the argument, holding that Title III requires only objective compliance with the minimization provision. *Id.* at 135–39, 98 S.Ct. at 1722–1724. All the Government need show is that the calls which were intercepted would still have been monitored even if the listening agents had actually attempted to minimize. By itself, an absence of good faith does not establish a statutory violation.

The *Scott* Court, to be sure, never held that good faith cannot be considered at all when ruling on a minimization claim.[17] Strictly speaking, the Court held only that a finding of violation cannot be premised *solely* upon proof that good faith was lacking. Nevertheless, fidelity to the spirit of *Scott* mandates that the good faith element play only a small role in the inquiry. Defendants cannot establish the existence of a "general search" if their proof is geared heavily towards showing only a lack of good faith efforts.

█ Defendants must rather place their emphasis upon facts showing that failures to minimize actually occurred an inordinate number of times.[18] Defendants bear a heavy burden in this regard;[19] the *Heldt*

---

**16.** The agents were, however, aware of the requirement. *Scott v. United States, supra,* 436 U.S. at 133, 98 S.Ct. at 1721.

**17.** Post *Scott* minimization decisions continue to mention the existence *vel non* of good faith. *See United States v. Santora,* 600 F.2d 1317, 1320 (9th Cir. 1979); *United States v. Dorfman, supra,* at 392.

The Supreme Court itself indicated that good faith might be relevant in "determining the propriety of applying the exclusionary rule" in wiretap cases. *Scott v. United States, supra,* 436 U.S. at 139 n.13, 98 S.Ct. at 1724 n.13.

**18.** However, the *Heldt* Court indicated that at least *some* showing of bad faith is needed to support a "general search" finding:

> Thus a good faith attempt to stay within the boundaries of an inherently broad warrant will support a finding that the search—taken as a whole—was reasonable, even though a majority of documents might turn out not to qualify for inclusion on more leisurely reflection.

*United States v. Heldt, supra,* 668 F.2d at 1269. I need not reach the issue. Defendants have failed to show that anything close to half the intercepted calls were improperly monitored.

**19.** Once the Government makes "a *prima facie* showing of reasonableness," defendants bear the ultimate burden of persuasion of the issue of minimization. *United States v. Quintana, supra,* 508 F.2d at 875.

requirement of "flagrant disregard" is extremely difficult to surmount. *Church of Scientology of California v. Linberg,* 529 F.Supp. 945, 965 (C.D.Cal.1981). If all the defendants can show are "isolated instances" of excessive monitoring, they are not entitled to the total suppression order they seek. *In re Search Warrant Dated July 4, 1977, etc.,* 667 F.2d 117, 130 (D.C.Cir.1981). Violations of an "egregious magnitude" must be proven. *United States v. Heldt, supra,* 668 F.2d at 1269.

In the course of two sets of hearings held on minimization, the Government submitted Government Wiretap Exhibits 32 and 34. These are charts detailing the Government's characterization of each completed call that was overheard at least in part during the Arra I surveillance. Exhibit 32 pertains to the monitoring that was conducted on telephone line (312) 246–0199; Exhibit 34 describes the monitoring of Arra's second phone line, (312) 246–0663.

Drug Enforcement Administration ("DEA") agent Carl Ekman prepared Exhibit 32. During the actual time that the Arra I phone calls were overheard, Agent Ekman was a field surveillance agent assigned to the Arra investigation. Except on rare occasions, Agent Ekman did not personally monitor the Arra I calls as they were being made.

In the late summer of 1981, Agent Ekman began to work on Exhibit 32. He examined each intercepted[20] call and assigned it to one of the following categories:

*Drug Related.* These were calls in which narcotics were discussed in some fashion —e.g., their use, their availability, or their price.

*Minimized.* These calls were not overheard in their entirety.

*Too Short to Minimize.* These calls, in Agent Ekman's judgment, terminated before it was possible to determine whether they were germane to the investigation.

*Criminal Intelligence.* These calls discussed criminal activities not specifically related to drug-trafficking.

*Non-Criminal Intelligence.* These calls provided general intelligence information —e.g., the alleged co-conspirators' prospective travel plans.

*Identifying Participant.* These calls helped identify individuals thought to be involved in some way with the drug "organization" under investigation.

*Wrong Number.* These calls were either incoming or outgoing transmissions that reached the wrong number.

*Information/Time.* These calls were made either to get a recorded "time" message or to obtain a phone number from the operator.

*Reservations.* These were calls in which the caller made a reservation (e.g., with an airline or a restaurant).

*Other.* All calls that did not fit the other categories were placed in "Other."

Agent Ekman made further distinctions within the "Drug Related," "Minimized," "Too Short to Minimize," "Criminal Intelligence," "Non-Criminal Intelligence," and "Other" categories. Calls of these types that he considered to be "Between Persons Then Known To Be Involved in Drug Trafficking" were totaled separately from those believed to be "To or From Other Persons." Under each of his column headings, Agent Ekman placed the reference numbers[21] of the specific calls described by the heading. In a few cases, Agent Ekman was unable to

---

**20.** Agent Ekman personally listened to the recording of many calls. In other cases, he relied on the descriptions contained in the logbooks which were maintained by the agents who actually monitored the calls in 1978.

**21.** Any given interception can be identified by three facts: the telephone line over which it was intercepted, the reel of tape on which it appears, and its sequential call number on that tape. Thus, "Blue 33–11" refers to the elev-

enth call taped on the 33rd reel of the Blue intercept.

The "Blue" and "Orange" intercepts refer to the taps placed on Arra's two telephone lines; the "Green" intercept was the tap placed on Michael Bounos' phone.

A new reel was begun at the start of each 8 hour shift worked by the monitoring agents. If more than one reel was used during a shift, the second reel contained the letter "A" in its designation, e.g., "43A."

decide whether a given call fit more properly within one category or another; he consequently listed the call in both.

In deciding how to characterize each call, Agent Ekman attempted to place himself in the shoes of an agent monitoring the call as it actually occurred in June 1978. He tried to divorce himself from what he had learned of the investigation in the intervening three years. He candidly admitted that this was often a difficult task.

DEA Special Agent Jerry Jezek prepared Exhibit 34. He used the same headings and followed the same procedures that Agent Ekman had used with Exhibit 32. Agent Jezek testified that he and Agent Ekman agreed upon the definitions that were assigned to each heading. The two agents did not, however, cross-check each other's work for accuracy and consistency.[22] Agent Jezek conceded that he too found it difficult to filter out completely all the information he had learned between 1978 and 1981.

Together, the two charts reveal that 910 completed calls were intercepted during the Arra I surveillance. By category, the Government submits that these calls break down as follows: [23]

| | |
|---|---|
| Drug Related | 16% |
| Minimized | 31% |
| Too Short to Minimize | 22% |
| Criminal Intelligence | 2% |
| Non-Criminal Intelligence | 15% |
| Identifying Participant | 2% |
| Wrong Number | 3% |
| Information/Time | 6% |
| Reservations | 1% |
| Other | 4% |

Defendants' initial response is that these figures are completely meaningless. First, they charge that the "Drug Related" and "Minimized" categories are overinclusive and give the false impression that the monitoring agents properly handled each call listed under the two headings. They point out that it is conceivable that a call might contain a reference to drugs, and therefore be "Drug Related," yet still be subject to minimization. As Judge Marshall explains:

> We do not simply focus on the individual conversation and determine whether it contains any incriminating statements; rather, where a pattern of unlawful interception is established we examine the challenged interceptions to determine whether they fall within that pattern. If the government continues to intercept, for example, a person not named in the authorizing order after his or her identity has been established and a pattern of innocent conversation takes place, it would be of no moment that eventually that individual was heard discussing incriminating matter; the conversation would still be subject to suppression because it would have been "unlawful" for the monitors to be overhearing the conversation in the first instance.

*United States v. Dorfman, supra,* at 395. Defendants also take issue with the broad definition of "Drug Related" used by Agents Ekman and Jezek. For the purpose of Exhibits 32 and 34, a call became "Drug Related" the minute a caller announced that he was "stoned." Such calls, defendants argue, were "Drug Related" in only the most superficial manner, disclosed no information relative to the conspiracy, and were not subject to seizure under the warrant.

In a similar vein, defendants attack the "Minimized" total. Since Agents Ekman and Jezek considered a call "Minimized" even if the monitoring ceased for only a second, defendants theorize that many "Minimized" calls might actually have been recorded for substantial periods of time. Therefore, even if a call was "minimized" in the sense used by Agents Ekman and Jezek, it might still have been unreasonably intercepted.

---

**22.** The two agents apparently disagreed on at least one thing—the persons who were initially suspected of being a part of Arra's "organization." Agent Ekman listed defendants Arra, Bounos, Hillon and Browning, as well as two non-defendants, Paula Guthery and Scott Cordray. Agent Jezek mentioned the first five, but not Cordray. Defendants have made no showing that this discrepancy is material.

**23.** Because of rounding, these numbers sum to more than 100%.

■ Defendants' arguments miss the mark. The Government's burden in a minimization hearing is simply to put on a prima facie case. Once such a showing is made, the ultimate burden of persuasion rests with the defendants, not the state. *See* note 19, *supra.* Therefore, proof that a call was "Drug Related" or "Minimized," even in the broad senses used by the agents, is sufficient to shift to the *defendants* the burden of proving that these labels are misleading. Defendants cannot attack the charts simply because they do not provide information which defendants themselves are obligated to muster.

■ Moreover, transcripts of all Drug Related calls have now been prepared by the Government and read by the court. Each transcribed call on the Arra I surveillance designated Drug Related was drug related in a significant respect.[24] Also, the evidence presented at the hearing does not support the claim that calls were only minimized for a few seconds. The minimization was substantial.

Defendants next challenge the "Too Short to Minimize," "Criminal Intelligence," "Non-Criminal Intelligence," and "Other" totals on different grounds. Their claim here is basically that these categories are interchangeable since many calls could have been placed under two or more such headings. It follows that the ultimate placement of the relevant calls depended primarily, if not entirely, on the subjective judgment of the agent making the chart. This state of affairs is objectionable to defendants on two grounds. First, the relevant category totals become nothing more than meaningless summations of random guesses. Second, Rule 1006 of the Federal Rules

of Evidence does not allow the presentation of judgments in chart form.

The first argument fails for the simple reason that it has not been substantiated. In their briefs, defendants point to few, if any, concrete examples of irrational categorization. They have failed to make a substantial showing that similar calls were placed in different categories or that disparate calls were lumped together under one heading. Defendants have had nearly two weeks of hearings in which to elicit their evidence and two briefs in which to marshal it. In light of their failure to make any semblance of a convincing showing, the court can only conclude that their fears are little better than speculative. They are not grounds for disregarding the Government's charts.[25]

The second argument is equally unpersuasive. The charts simply summarize the agents' testimony as to "the contents of voluminous ... recordings ... which cannot conveniently be examined in court." Fed.R.Evid. 1006. This is permissible under the rules. Any other result would be shocking. Both the Supreme Court and the D.C. Circuit relied in the *Scott* litigation on charts embodying judgments which were equally, if not more, subjective than those made here. *See United States v. Scott,* 516 F.2d 751, 754 n.3 (D.C.Cir.1975).[26]

■ Defendants' fall-back position is that even if the charts are admissible, they fail to establish a prima facie case of overall reasonableness. They argue that only 16% of the intercepted calls were drug-related and that this statistic fails woefully in comparison with the 40% mark achieved in *Scott.* However, under *Scott,* "blind reliance on the percentage of nonpertinent

---

**24.** Although I have not completed an analysis of all of the Drug Related calls on all of the taps, the pattern seems clear. The calls designated Drug Related were almost all substantially drug related. Some of the calls nevertheless were minimized.

**25.** This is not to say that borders separating these categories are clearcut and distinct in all cases. Indeed, the agents implicitly admitted as much whenever they placed a call in two categories. *See* pp. 1043–1044, *supra.*

**26.** In any event, defendants do not challenge the competency of the agents to render their views in some fashion. Defendants take issue only with the use of charts. They presumably would prefer the agents to testify about each call individually. The court can clearly allow the admission of the charts in order to avoid such a "needless consumption of time." Fed.R. Evid. 611(a).

calls intercepted is not a sure guide to the correct answer." *Scott v. United States, supra*, 436 U.S. at 140, 98 S.Ct. at 1724. The issue is whether the Government's interceptions were reasonable, not whether they were always an investigatory success.

The analysis must therefore focus on the 69% of the calls which were not minimized. When viewed from this perspective, the chart figures clearly constitute a prima facie showing that the bulk of the non-minimized interceptions were reasonable. With the exception of the calls categorized as "Other," plausible justifications have been offered for the monitoring of each non-minimized conversation. As for the calls placed in the "Drug Related," "Too Short to Minimize," "Criminal Intelligence," and "Identifying Participant" categories, the necessary justifications are patent and need not be explained. The interception of "Non-Criminal Intelligence" calls was also important because the information these interceptions provided facilitated the 24 hour-a-day physical surveillance then being maintained over the suspects.[27] The same is true of the "Information/Time" and "Reservations" calls. The "Wrong Number" category appears in large measure to be a subset of "Too Short to Minimize": a listening agent could hardly have known that a call was a "wrong number" until it was virtually completed. On the other hand, no justifications have been offered for the interception of the "Other" calls. Agent Jezek admitted in fact that these calls consisted only of "general conversations." I agree with defendants that "Other" is really a euphemism for "Should Have Been Minimized."

Nevertheless, the "Other" category contains only 4% of the total number of completed calls. The Government's failure to justify such a small percentage does not undercut its position. The figures revealed by Exhibits 32 and 34, taken as a whole, make clear that the Government successfully established a prima facie case that no general search had occurred.

The burden thus shifts to the defendants to go behind these raw numbers and show that an inordinate number of unreasonable interceptions nevertheless occurred. Defendants, however, complain in their briefs about only a very few calls. They challenge first the Government's record with four conversations which are claimed to contain privileged discussions. They also maintain that the agents disregarded patterns of innocence that had developed with respect to conversations between Thomas Arra and his parents, Jennifer Arra and her mother, Jennifer Arra and her friends, and Paula Guthery and her family.

In the main, the evidence does not support the defendants. The Government's handling of the privileged calls appears reasonable:

In chronological order, the first such call defense counsel inquired about in the January, 1982 hearing was Blue 30–26. In that call, which lasted a total of 45 seconds, Tom Arra called a number, spoke with a receptionist, and changed his dental appointment. In the second call, Blue 30–32, which lasted a total of 35 seconds, Paula Guthery called a number, spoke with a receptionist, and changed her doctor appointment. In the third call, Blue 52–11, Arra called an office and spoke with a female. Arra asked for an individual. The female said he is not in. Arra then asked to speak with another male, Frank DeSalvo. All this took 32 seconds. Arra was then placed on hold for 38 more seconds. Arra and a male then discussed the male coming into the middle of the case and fees. The monitoring agents then pushed the minimization button after 49 seconds and no further conversation was intercepted. In the fourth and last call, Blue 55–5, Arra called Doug's office and a female said Doug was not in. In the remainder of the two minutes and nine seconds, Arra and the female discussed why Doug never called Arra back. The monitoring

---

**27.** Because the suspects drove at such high rates of speed, surveillance was often difficult. When the DEA knew where the suspects were headed, a backup crew of agents could await their arrival at their destination.

agents' actions in these four calls are not "telling examples of the defective approach taken in the minimization process," as defendants contend. Two of the four calls are very short, 35 and 45 seconds. The third was minimized when it became apparent that lawyer-client discussions might be underway. The last call contained no lawyer-client style discussions.

Government's Reply to Defendants' Post-Hearing Memorandum at 13–14. Many of the calls between Paula Guthery and her sister and mother were also minimized to a substantial degree. Furthermore, the mere fact that Jennifer Arra spoke in a conversation did not invariably render that call innocent from the outset. On occasion, Jennifer took messages for her father, and sometimes, she handed the phone to others after she had spoken. Also, when Jennifer answered the phone the caller would identify himself, thus making identification of the caller possible.

At best defendants have shown that the monitoring may have been excessive in a few instances. They have fallen far short of proving that the Government's errors were of such a magnitude that total suppression is warranted. *See United States v. Heldt, supra,* 668 F.2d at 1268–69; *In re Search Warrant Dated July 4, 1977, etc., supra,* 667 F.2d at 130; *United States v. DePalma,* 461 F.Supp. 800, 822 (S.D.N.Y. 1978). Several additional considerations bolster this conclusion:

(1) This investigation was instituted to gain an understanding of a conspiracy of unknown dimensions. Especially at the beginning, the agents were entitled to operate under the assumption that virtually no one was above suspicion.

(2) The United States Attorneys supervising this surveillance were required by Judge Parsons to file regular reports every five days detailing the progress that had been made toward "cracking" the conspiracy and the efforts which had been made to minimize. These reports were usually submitted within one day after the end of the five day interval. Judge Parsons never terminated the surveillance.

(3) The record shows that the agents consistently minimized portions of *calls between known co-conspirators.* There could hardly be stronger evidence of good faith efforts to minimize.

(4) It was difficult for the agents to get a fix on many calls. Some had multiple topics. Others had multiple speakers. Code words were often used. The conversations were often incoherent and rambling.

For all the reasons stated, defendants' "general search" theory is rejected. The motion to suppress the fruits of the Arra I surveillance is denied.[28]

---

**28.** Originally, it was the Court's intention to defer ruling on the "general search" theory until all the evidence had been heard on all five wiretaps employed in this investigation. This route seemed most logical as all five taps appeared to be interrelated aspects of one integrated surveillance. At the parties' request, however, this opinion was prepared in order to shed some light on the Court's thinking. If subsequently developed evidence indicates that a "general search" was conducted during the remaining four taps, the ultimate conclusions reached herein may be subject to revision.

Defendants also remain free to challenge the interception of particular calls on the ground that they were individually outside the scope of the warrant. *See generally In re Search Warrant Dated July 4, 1977, etc., supra,* 667 F.2d at 142 (Separate opinion of Wald, J., in which Robinson, C. J., concurs).